# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL 2724** |
| | **Civ. No. 2:18-cv-04137-CMR** |
| **THIS DOCUMENT RELATES TO:** | **JURY TRIAL DEMANDED** |
| | **FIRST AMENDED COMPLAINT CLASS ACTION** |
| *Marion Diagnostic Center, LLC, et al. v. McKesson Corporation, et al.* | **PUBLIC VERSION** |

REDACTED PURSUANT TO PROTECTIVE ORDER

## Table of Contents

**AN OVERARCHING CONSPIRACY EXTENDS ACROSS THE GENERIC DRUG INDUSTRY** ........................................................................ 1

**JURISDICTION AND VENUE** ............................................................. 3

**PARTIES** ................................................................................................ 4

    Plaintiffs ........................................................................................... 4

    Defendant Distributors .................................................................... 5

    Defendant Manufacturers ............................................................... 6

**MARKET STRUCTURE** ....................................................................... 9

**GOVERNMENT INVESTIGATIONS ARE ONGOING** ................... 11

**THE CONSPIRACY FIXES PRICES ACROSS THE GENERIC DRUG INDUSTRY** ...... 13

    Market Allocation ......................................................................... 14

    Price Fixing .................................................................................... 14

    Generic Drug Price Spikes Since 2013 ........................................ 20

**MCKESSON COOPERATES WITH, AND HELPS CONCEAL, THE CONSPIRACY** .... 21

    McKesson Has Been Aware of the Industry-Wide Conspiracy Lasting Several Years .... 22

        McKesson Has Been Aware of the Conspiracy Given Its ██████████ With Central Conspirator Heritage .......................................... 24

        Movement of Knowledgeable Officers Among McKesson and Central Conspirators Mylan and Teva Facilitates McKesson's Collusion ............... 25

    Follow the Money: McKesson's Has Made Billions in Additional Margin by Conspiratorial Cooperation and Concealment ................... 28

    A Knowledgeable Industry Analyst Concludes that McKesson (and Other Large Distributors) Have Not Found It in Their Interest to "Keep in Check" the Conspiracy's Pricing ........................................ 30

    SAG Allegation Is Consistent with McKesson Conspiratorial Cooperation .... 31

REDACTED PURSUANT TO PROTECTIVE ORDER

Connecticut Is Reportedly Investigating McKesson and Other Large Distributors ..........32

McKesson Sponsored Meetings Have Facilitated McKesson's Cooperation
with the Conspiracy ......................................................................................................32

In Return for Billions of Dollars of Additional Annual Margin, McKesson Has
Participated as a Tacit Co-Conspirator at the Very Least...................................................34

**CLASS ACTION ALLEGATIONS** ........................................................................................35

Class of Direct Purchasers From Conspirator McKesson..................................................35

**ANTITRUST INJURY** ........................................................................................................37

**STANDING** ........................................................................................................................38

**COUNT I**

Restraint of Trade (Section 1 of the Sherman Act)...........................................................38

**SUPPLEMENTAL JURISDICTION**...................................................................................39

Indirect-Purchaser Healthcare Class ................................................................................39

**COUNTS II - XXVIII** ........................................................................................................41

**PRAYER FOR RELIEF** ......................................................................................................61

**JURY DEMAND** ................................................................................................................61

REDACTED PURSUANT TO PROTECTIVE ORDER

1.      Plaintiffs Marion Diagnostic Center, LLC and Marion Healthcare, LLC on behalf of themselves and all others similarly situated, bring this action on behalf of direct purchasers of generic drugs from an overarching, industry-wide conspiracy comprised of Defendant manufacturers of generic drugs, the largest distributor of these drugs McKesson Corporation and its controlled subsidiary McKesson Medical-Surgical Inc. (collectively "McKesson"), and other unnamed distributor co-conspirators.

2.      In the pharmaceutical industry the entry of generic versions of branded drugs usually results in aggressive price competition, which in turn results in lower prices for end users.  Defendants conspired to thwart this process, and to deny consumers the benefits of competition.  Defendants did so by entering into an unlawful overarching horizontal and vertical distributor conspiracy including McKesson to fix prices and to allocate sales among themselves for generic drugs across the industry. Their conduct is a *per se* violation of Section One of the Sherman Act, 15 U.S.C § 1. Plaintiffs seek damage and injunctive relief.

## AN OVERARCHING CONSPIRACY EXTENDS ACROSS
## THE GENERIC DRUG INDUSTRY

3.      Defendants' and other generic drug sellers' conduct is the subject of an extensive ongoing investigation by the Antitrust Division of the Department of Justice ("DOJ"). DOJ has empaneled a federal grand jury in this District, which has issued subpoenas relating to price fixing and market allocation in the generic pharmaceutical industry to distributors and manufacturers of generic drugs. The DOJ has acknowledged that its investigation overlaps with the scope of this MDL. For example, DOJ filed a motion for a stay of discovery in the MDL arguing that:

REDACTED PURUSANT TO PROTECTIVE ORDER

[e]vidence uncovered during the criminal investigation implicates other companies and individuals (including a significant number of the Defendants here) in collusion with respect to doxycycline nyclate, glyburide, *and other drugs (including a significant number of the drugs at issue here).*[1]

4.      Soon after DOJ filed criminal charges, 20 state attorneys general led by the State of Connecticut, sued several generic manufacturers for bid rigging, price-fixing and market allocation in connection with their sale of generic glyburide and doxycycline in the United States. ("State Attorney General Action"). Under an amended complaint accepted for filing by this Court,[2]  State Attorneys General of 44 states and the District of Columbia are prosecuting a consolidated action alleging price fixing and market allocation by numerous firms selling 15 generic drugs:  Acetazolamide, Doxycycline Hyclate Delayed Release, Doxycycline Monohydrate, Fosinopril-Hydrochlorothiazide, Glipizide-Metformin, Glyburide, Glyburide-Metformin, Leflunomide, Meprobamate, Nimodipine, Nystatin, Paromomycin, Theophylline, Verapamil, and Zoledronic Acid among others. SAG Complt. ¶¶ 1, 13.  On December 9, 2018, Mr. Joseph Nielsen, Assistant Attorney General for Connecticut, indicated that the scale of the overarching conspiracy had "dramatically expanded" to encompass at least 300 generic pharmaceuticals.[3]

5.      Like the DOJ, among others, the amended State Attorney General Action alleges in part "that Defendants participated in an overarching conspiracy, the effect of which to 'minimize if not thwart competition across the generic drug industry' through a series of specific conspiracies." *Id.* ¶ 2.

---

[1] Intervenor United States' Motion to Stay Discovery, In re: Generic Pharm. Pricing Antitrust Litig., MDL No. 2724, ECF 279 (E.D. Pa. May 1, 2017)

[2] ECF No. 15 (17-cv-03768) ("SAG Complt.") (all references herein are to the sealed SAG Complaint with text redacted in public version pursuant to Protective Order).

[3] https://www.washingtonpost.com/business/economy/investigation-of-generic-cartel-expands-to-300-drugs/2018/12/09/fb900e80-f708-11e8-863c-9e2f864d47e7_story.html?utm_term=.d21dbc5d4b42

REDACTED PURSUANT TO PROTECTIVE ORDER

6.      The massive increases in the prices of generic drugs since 2013-14, which cannot be reasonably explained by rising costs or other competitive market conditions, strongly indicate that this pricing has been affected by unlawful conspiracy across generic drug industry. In part Plaintiffs rely on allegations and the disclosed results of the federal and state investigations of anticompetitive conspiracies involving a large number of generic drugs.

7.      This action expands, however, the existing allegations as to the scope of the overarching generic conspiracy. It addresses compelling indications that the largest Defendant manufacturers (particularly Heritage Pharmaceuticals, Inc., Mylan Pharmaceuticals Inc., and Teva Pharmaceuticals, USA, Inc.) have enlisted tacitly or explicitly distributor McKesson as a cooperating co-conspirator (and possibly other unnamed distributors) to aid and conceal their price fixing and market allocation across the generic drug industry.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this damage and injunctive action under 28 U.S.C. §§ 1331 and 1337; Section 1 of the Sherman Act, 15 U.S.C. § 1; Section 4 of the Clayton Act, 15 U.S.C. § 15; and Section 16 of the Clayton Act, 15 U.S.C. § 26.

9.      Venue is proper in this District under 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c), and (d), because defendants transact business throughout the United States, including in this District, because defendants reside within this District, and because a portion of the affected interstate trade and commerce discussed below was carried out in this District. Defendants have sold and distributed generic pharmaceuticals in interstate commerce in the United States and this District. Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District.

REDACTED PURSUANT TO PROTECTIVE ORDER

10.     This Court has personal jurisdiction over each defendant because, *inter alia*, each defendant: (a) transacts business throughout the United States, including in this District; (b) participates in the selling and distribution of generic drugs throughout the United States, including in this District; (c) has maintained substantial contacts within the United States, including in this District; and/or (d) has engaged in an unlawful conspiracy to inflate the prices for generic drugs generally, injuring persons doing business throughout the United States, including in this District.

11.     This Court has supplemental jurisdiction over state law damage claims alleged in the alternative in Counts II-XXVIII by virtue of its original jurisdiction over federal injunctive claims pursuant to 28 U.S.C. § 1367(a).

## PARTIES

### Plaintiffs

12.     Plaintiff Marion Diagnostic Center LLC is a limited liability company formed under the laws of the State of Illinois, with its principal place of business in Marion, Illinois. Marion Diagnostic operates a multidisciplinary healthcare facility including an outpatient surgery practice, a diagnostic center, and a walk-in clinic. Marion Diagnostic has directly purchased generic drugs through distributor defendant McKesson Medical-Surgical, Inc. (in part and over the last year alone): Albuterol, Lidocaine, Ondansetron, Diphenhydramine, Ceftriaxone, Ketorolac, Tromethamine, Triamcinolone Acetonide, Olopatadine, Marcaine, Tetracaine, Gentamicin, Gentak, Gentamicin Sulfate, Flucaine, Ondansetron, Proparacaine, Promethazine, Ofloxacin, Erythromycin, and Silvadene. Among the manufacturers of these generic drugs are Defendants Heritage, Apotex, Sandoz, Dr. Reddy's and Aurobindo.

REDACTED PURSUANT TO PROTECTIVE ORDER

13.     Plaintiff Marion HealthCare, LLC is a limited liability company formed under the laws of the State of Illinois, with its principal place of business in Marion, Illinois. Marion HealthCare, which is owned and operated by area physicians, operates a multi-specialty surgery center in Marion. Marion HealthCare has directly purchased the following generic drugs through distributor defendant McKesson Medical-Surgical, Inc. (in part and over the last year alone): Acetam, Acetaminophen, Albuterol, Amiodarone, Atropine, Betadine, Calmoseptine, Cefazolin, Ceftriaxone, Cefoxitin, Ceftazidime, Cetriazone, Cleocin Phosphate, Clonidine, Dantrium, Dexamethasone, Digoxin, Diphenhydramine, Dopamine, Ephedrine, Epinephrine, Esmolol, Famotidine, Gentamicin Sulfate, Glycopyrrolate, Heparin Sodium, Humulin R, Hydralazine, Ibuprofen, Ketorolac Tromethamine, Ketorolac, Labetalol, Levalbuterol, Lidocaine, Marcaine, Methylergonovine, Metoprolol Tartrate, Metronidazole, Midazolam Hcl, Mitomycin, Mupirocin, Naloxone, Nasal Decongestant, Ofloxacin, Ointment, Ondansetron, Oxybutynin, Phenylaphrine, Pilocarpine, Promethazine, Proparacaine, Propofol, Racemic Epi, Ranitidine, Scopolamine, Sodium Bicarb, Sodium Chloride, Tobramycin Sulfate, Triple Antibiotic, Tropicamide, and Vancomycin. Among the manufacturers of these generic drugs are Defendants Heritage, Apotex, Sandoz, Dr. Reddy's and Aurobindo.

## **Defendant Distributors**

14.     Defendant McKesson Corporation is a corporation formed under the laws of Delaware, with its principal place of business in San Francisco, California. McKesson (including its subsidiary McKesson Medical-Surgical, Inc.) is one of the four largest distributors of generic drugs in the United States.

REDACTED PURSUANT TO PROTECTIVE ORDER

15. Defendant McKesson Medical-Surgical Inc., is a corporation formed under the laws of Virginia, with its principal place of business in Richmond, Virginia. It is a controlled subsidiary of McKesson Corporation (collectively "McKesson").

### Defendant Manufacturers

16. Defendant Ascend Laboratories, LLC ("Ascend") is a corporation formed under the laws of the State of New Jersey, with a principal place of business in Parsippany, New Jersey. is in the business of, manufacturing generic versions of branded pharmaceutical products for distribution in the United States.

17. Defendant Apotex Corp. ("Apotex") is a corporation formed under the laws of the State of Delaware. Its principal place of business is Weston, Florida. Apotex is in the business of, manufacturing and selling generic pharmaceutical products for distribution in this District and throughout the United States.

18. Defendant Aurobindo Pharma USA, Inc. ("Aurobindo") is a corporation formed under the laws of the State of Delaware with its principal place of business at Dayton, New Jersey. Aurobindo has marketed and sold generic pharmaceuticals in this District and throughout the United States.

19. Defendant Citron Pharma, LLC ("Citron") is a corporation formed under the laws of the State of New Jersey with its principal place of business at East Brunswick, New Jersey. Citron has marketed and sold generic pharmaceuticals in this District and throughout the United States.

20. Defendant Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") is a corporation formed under the laws of the State of Delaware with its principal place of business at Princeton, New

REDACTED PURSUANT TO PROTECTIVE ORDER

Jersey. Dr. Reddy's has marketed and sold generic pharmaceuticals in this District and throughout the United States.

21.     Defendant Emcure Pharmaceuticals, Ltd. ("Emcure") is a corporation formed under the laws of India, having its principal place of business in Pune, India. Emcure is the parent company of Defendant Heritage Pharmaceuticals, Inc. ("Heritage") and another U.S.-based entity, Emcure Pharmaceuticals USA, Inc., which has a principal place of business in East Brunswick, New Jersey. Emcure has marketed and sold generic pharmaceuticals in this District and throughout the United States, and has also participated in and directed the business activities of Defendant Heritage.

22.     Defendant Glenmark Pharmaceuticals, Inc., USA ("Glenmark") is a corporation formed under the laws of the State of Delaware with a principal place of business at  Mahwah, New Jersey. Glenmark has marketed and sold generic pharmaceuticals in this District and throughout the United States.

23.     Defendant Heritage Pharmaceuticals, Inc. ("Heritage") is a corporation formed under the laws of the State of Delaware with its principal place of business at  Eatontown, New Jersey. Heritage is a wholly-owned subsidiary of Defendant Emcure. Heritage has marketed and sold generic pharmaceuticals in this District and throughout the United States.

24.     Defendant Lannett Company, Inc. ("Lannett") is a corporation formed under the laws of the State of Delaware with its principal place of business at Philadelphia, Pennsylvania. Lannett has marketed and sold generic pharmaceuticals in this District and throughout the United States.

25.     Defendant Mayne Pharma Inc. ("Mayne") is a corporation formed under the laws of the State of Delaware with its principal place of business at  Raleigh, North Carolina. In 2012,

REDACTED PURSUANT TO PROTECTIVE ORDER

Mayne acquired Metrics, Inc. and its division, Midlothian Laboratories ("Midlothian"), and has also operated under the name Midlothian since that time. Mayne has marketed and sold generic pharmaceuticals in this District and throughout the United States.

26.     Defendant Mylan Inc. is a corporation formed under the laws of the State of Pennsylvania with its principal place of business in Canonsburg, Pennsylvania.

27.     Defendant Mylan Pharmaceuticals Inc. is a corporation formed under the laws of the State or West Virginia with its principal place of business in Morgantown, West Virginia.

28.     Mylan Inc. and Mylan Pharmaceuticals Inc. (collectively "Mylan") are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company. Mylan has marketed and sold generic pharmaceuticals in this District and throughout the United States.

29.     Defendant Par Pharmaceutical Companies, Inc. ("Par") is a corporation formed under the laws of the State of Delaware with its principal place of business at Chestnut Ridge, New York. Par has marketed and sold generic pharmaceuticals in this District and throughout the United States.

30.     Defendant Sandoz, Inc. ("Sandoz") is a corporation formed under the laws of the State of Colorado, with its principal place of business at Princeton, New Jersey. Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland. Sandoz has marketed and sold generic pharmaceuticals in this District and throughout the United States.

31.     Defendant Sun Pharmaceutical Industries, Inc. ("Sun") is a corporation formed under the laws of the State of Michigan  with its principal place of business at Cranbury, New Jersey. Sun is a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd., an Indian

REDACTED PURSUANT TO PROTECTIVE ORDER

corporation. Sun has marketed and sold generic pharmaceuticals in this District and throughout the United States.

32.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva") is a corporation formed under the laws of the State of Delaware with its principal place of business at  North Wales, Pennsylvania. Teva has marketed and sold generic pharmaceuticals in this District and throughout the United States.

33.     Defendant Zydus Pharmaceuticals (USA) Inc. ("Zydus") is a corporation formed under the laws of the State of New Jersey with its principal place of business at North, Pennington, New Jersey. Zydus has marketed and sold generic pharmaceuticals in this District and throughout the United States.

34.     On information and belief, there are additional unnamed distributors conspiring with defendants, whose identities currently are unknown.

## MARKET STRUCTURE

35.     **Drug Manufacturers.** Generic sales start with a drug manufacturer, such as Defendants manufacturers, which produces a generic drug that can be substituted for a branded drug once the brand's period of exclusivity expires. Generics are lower-cost and bioequivalent alternatives to brand-name drugs. A manufacturer must obtain approval for its generic product from the Food and Drug Administration, which evaluates, among other things, the generic drug's safety and efficacy. According to a 2015 report by the Generic Pharmaceutical Association ("GPhA") (now known as the Association for Accessible Medicines), 88% of all prescriptions in United States are filled with a generic drug.[4]

--------------------------

[4] http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf

REDACTED PURSUANT TO PROTECTIVE ORDER

36.     **Distributors.** Wholesalers and distributors purchase generic drugs from manufacturers, and distribute them to customers such as retail and mail-order pharmacies, hospitals, clinics and long-care and other medical facilities. Wholesalers and distributors have similar business models, but distributors typically provide more services to their customers.

37.     According to an analysis performed for the University of Southern California's Leonard D. Schaeffer Center for Health Policy and Economics, wholesalers and distributors typically retain as revenue approximately $8 of every $100 spend on generic drugs (compared to only $1 of every $100 spent on branded drugs).[5]

38.     Some of the largest wholesalers and distributors of generics are defendant McKesson, AmerisourceBergen Corporation, Cardinal Health, Inc., H.D. Smith, LLC, and Morris & Dickerson, LLC. Wholesalers and distributors (collectively "distributors") hold frequent multi-day conferences, to which generic drug manufacturers are invited.

39.     **Group Purchasing Organizations.** Group purchasing organizations ("GPOs") broker or purchase for resale generic drugs from manufacturers or distributors on behalf of their purchaser members. GPOs selling large volumes of generics nationwide include Vizient, Inc. and Premier, Inc.

40.     **Pharmacies and Supermarket Chains.** Pharmacies and supermarket chains selling large volumes of generic drugs may purchase them directly from the manufacturers to avoid the markups or fees charged by distributors or GPOs. Others may buy through GPOs or distributors.

41.     **Price Effect of Generic Entry.** In the pharmaceutical industry the entry of generic versions of branded drugs usually results in aggressive price competition, reducing prices

---

[5] Healthpolicy.usc.edu/documents/USC%20Schaeffer_Flow%20of%20Money_2017.pdf

REDACTED PURSUANT TO PROTECTIVE ORDER

for purchasers. Once a lower-priced generic enters a market its branded equivalent typically will lose sales rapidly, as the generic captures as much as 80% or more of the market within months of launch. And, as more generic versions of a drug become available, prices decline even further due to increased competition. This results in hundreds of billions of dollars in savings for purchasers.

42. **Factors Making Sales of Generics Susceptible to Collusion.** Several factors make sales of generics susceptible to collusion: (1) a high degree of industry concentration as to some generic drugs; (2) significant capital, regulatory, and intellectual property barriers to entry; (3) inelastic demand; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

## GOVERNMENT INVESTIGATIONS ARE ONGOING

43. In its extensive ongoing investigation the DOJ in the summer of 2016 received cooperation from an applicant for leniency under DOJ's "first-in-the-door" policy. According to *Mlex*, a publication that covers antitrust matters:

> While the Justice department didn't have a whistleblower at the beginning of the investigation, it is understood that this summer a company applied for leniency, which grants full immunity to the first company to come forward and admit to cartel violations.

The cooperating company is understood to be privately held, and has not publicly disclosed its involvement in the investigation.

44. Also in 2016, DOJ filed its first criminal Informations against two former executives of Heritage Pharmaceuticals: Jeffrey Glazer and Jason Malek. *See United States v. Jeffrey A. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); *United States v. Jason T. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.). It alleged that both Glazer and Malek conspired with others "to allocate customers, rig bids, and fix and maintain prices" of generic glyburide and doxycycline

REDACTED PURSUANT TO PROTECTIVE ORDER

sold in the United States. Each was charged with two felony counts under the Section One of the Sherman Act, 15 U.S.C. § 1. On January 9, 2017, both Glazer and Malek pleaded guilty to the charges. They continue to cooperate with DOJ's ongoing criminal investigation as they await sentencing.

45.     As noted, the DOJ has acknowledged that its investigation overlaps with the scope of this MDL.

46.     Defendant Mylan has been ensnared in this criminal investigation. It disclosed in a 2016 filing with the Securities and Exchange Commission ("SEC") that it received a DOJ subpoena "seeking information relating to the marketing, pricing, and sale of our generic Doxycycline products and any communications with competitors about such products."[6] Mylan also has received a similar subpoena from the Attorney General of the State of Connecticut. On November 9, 2016, Mylan disclosed in its SEC quarterly report that both it and "certain employees and senior management, received subpoenas from DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products and any communications with competitors about such products."[7] Mylan also disclosed that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[8]

---

[6] Mylan, SEC 2015 Form 10-K (Feb. 16, 2016), at 160.

[7] Mylan SEC Form 10-Q (Nov. 9, 2016), at 58.

[8] *Id.*

REDACTED PURSUANT TO PROTECTIVE ORDER

47.     Defendant Sun also has received a grand jury subpoena as part of DOJ's criminal investigation.[9] Reportedly, DOJ asked Sun for documents related to employee and corporate records and communications with competitors.[10]

48.     In issuing grand jury subpoenas DOJ counsel are required to "consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."[11] According to Mark Rosman, a former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, "[a] DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[12]

### THE CONSPIRACY FIXES PRICES ACROSS THE GENERIC DRUG INDUSTRY

49.     There is a common understanding among generic manufacturers, including Defendant manufacturers, about what represents each company's ██████████ over time. This collusive methodology has evolved over time during the numerous in-person meetings, telephonic communications and other interactions between generic manufacturers about specific drugs over the course of several years, but general rules of the road have been in

---

[9] David McLaughlin and Caroline Chen, *U.S. Charges in Generic Drug Probe to be Filed by Year-End*, BLOOMBERG (Nov. 3, 2016), *available at* https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

[10] Zeba Siddiqui, *India's Sun Pharma Gets U.S. Subpoena Over Generic Drugs Pricing*, REUTERS (May 28, 2016), *available at* http://www.reuters.com/article/sun-pharm-usa-idUSL4N18P00X.

[11] DOJ, *Antitrust Division Manual* (5th ed. 2015) at III-82.

[12] *See DOJ's Investigation Into Generic Pharma Pricing Is Unusual*, *available at* https://www.law360.com/articles/595444/doj-s-investigation-into-generic-pharma-pricing-is-unusual.

REDACTED PURSUANT TO PROTECTIVE ORDER

place since at least 2006. These events occur with such great frequency that there is an almost constant ability for Defendant manufacturers to meet in person and discuss their business plans. For example, between February 20, 2013 and December 20, 2013 (a 41-week period), there were at least forty-four (44) different tradeshows or customer conferences where the Defendant manufacturer had the opportunity to meet in person. These in-person meetings gave them the opportunity to have these conversations, and reach these agreements, without fear of detection.

50.    This overarching conspiracy is widespread across the generic drug industry and is broader than the Defendant manufacturers named herein and includes Defendant McKesson and possibly other unnamed distributor co-conspirators.

51.    Relying largely on the several-year investigation of the State Attorneys General as set out in their amended complaint, Plaintiffs describe immediately below market allocation and price fixing conspiracies regarding the sale of specific drugs, and how these specific conspiracies are part of the larger overarching conspiracy including all, or nearly all generic drugs.

## Market Allocation

(a)    Nimodipine (SAG Complt. ¶¶ 115-134) (Heritage/Sun-Caraco)  (Ascend/ Heritage);

(b)    Zoledronic Acid (SAG Complt.  ¶¶ 149-164) (Heritage/Dr. Reddy's/Sun-Caraco);

(c)    Meprobamate (SAG Complt. ¶¶ 165-179) (Heritage/Dr. Reddy's); and

(d)    Doxy DR (SAG Complt. ¶¶ 180-242) (Heritage/Mylan/Mayne-Midlothian).

## Price Fixing

(a)    Doxycycline Monohydrate (SAG Complt. ¶ 246-267) (Heritage/Lannett/Par/ Mylan);

(b)    "Big Price Increases" Across Eighteen Drugs 2014 (SAG Complt. ¶¶ 268-305) (Heritage/Teva/Ascend/Sun-Caraco/Actabis/Lannett/Mylan/Aurobindo/Dr. Reddy's/Apotex/Sandoz);

REDACTED PURSUANT TO PROTECTIVE ORDER

(c)     Acetazolamide (SAG Complt. ¶¶ 295-305) (Heritage/Teva/Zydus);

(d)     Fosi-HCTZ (SAG Complt. ¶¶ 306-328) (Heritage/Aurobindo/Sandoz/Glenmark/ Citron);

(e)     Glipizide-Metformin (SAG Complt. ¶¶ 329-338) (Heritage/Teva/Mylan);

(f)     Glyburide (SAG Complt. ¶¶ 339-364) (Heritage/Teva/Aurbindo/Citron);

(g)     Glyburide-Metformin (SAG Complt. ¶¶ 365-379) (Heritage/Teva/Aurbindo/ Actavis/Citron/Sun);

(h)     Leflunomide (SAG Complt. ¶¶ 380-390) (Heritage/Apitex/Teva);

(i)     Nystatin (SAG Complt. ¶¶ 391-414 (Heritage/Sun-Mutual/Teva);

(j)     Paromomycin (SAG Complt. ¶¶ 415-426) (Heritage/Sun-Caraco);

(k)     Theophylline ER (SAG Complt. ¶¶ 427-442 (Heritage/Teva); and

(l)     Verapamil (SAG Complt. ¶¶ 443-453 (Heritage/Mylan/Actavia/Sun)

52.     The State Attorneys General's amended complaint alleges that from the period of July 1, 2013 through July 30, 2014, senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Defendant Heritage spoke to representatives of every other U.S.-based corporate manufacturing Defendant by phone and/or text on multiple occasions. The following Table (Table 1), which the State Attorneys General characterize as conservative (because it shows only some of the phone calls and text messages between the Defendant manufacturers during that period). It sheds some light on the frequency with which Defendant manufacturers have communicated with each other.

**Table 1**
**Heritage phone/text communications with other Defendants (by month)**
**July 1, 2013 – July 30, 2014**

| | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Jul-13 to Jul-14 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | | | | | | | | | | 2 | | | | 2 |
| Apotex | | | | | | | | | | | 17 | 2 | 1 | 20 |
| Ascend | | | | | | | | | | 1 | | | | 1 |
| Aurobindo | | | | | 1 | 1 | | 1 | | 5 | 2 | 1 | 3 | 14 |
| Citron | | | | 6 | 1 | 12 | | 7 | 1 | | 2 | 29 | 52 | 110 |
| DRL | 1 | 6 | 3 | 2 | | | | 1 | | 5 | 3 | | | 21 |

15

REDACTED PURSUANT TO PROTECTIVE ORDER

| | | | | | | | | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Glenmark | | | | | | | | | 1 | | | 3 | | 4 |
| Lannett | 0 | 35 | | 27 | | | 21 | 8 | | 3 | 3 | 14 | 2 | 113 |
| Mayne | | | | | | | 1 | | 2 | 7 | 3 | | | 13 |
| Mylan | 3 | 1 | | | 1 | | 1 | | 2 | 8 | | 2 | | 18 |
| Par | | | | | | | | | | | 3 | 6 | | 9 |
| Sandoz | | | | | | | | | | | 4 | 3 | | 7 |
| Sun | 1 | 2 | | 1 | | | | 3 | | 3 | 10 | 32 | 7 | 59 |
| Teva | 7 | 9 | | | | | | 5 | 5 | 3 | | 1 | 5 | 35 |
| Zydus | | 61 | 19 | 6 | | | | | | | | | 1 | 87 |
| | | | | | | | | | | | | | | 513 |

53.     Similarly, according to the State Attorneys General amended complaint, senior sales executives and other individuals responsible for the pricing, marketing and sales of generic drugs at Defendant Teva spoke by phone and/or exchanged text messages with representatives of every other U.S.-based corporate Defendant during the same time period as set out in the following Table (Table 2), which the State Attorneys General characterize as conservative (because it is based on phone and text message records from only some of the executives and salespeople at issue).

**Table 2**
**Teva phone/text communications with other Defendants (by month)**
**July 1, 2013 – July 30, 2014**

| | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Jul-13 to Jul-14 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actavis | | 11 | 16 | 37 | 11 | 35 | 25 | 14 | 36 | 30 | 63 | 13 | 43 | 334 |
| Apotex | 3 | 4 | | | | | | | | | | | | 7 |
| Ascend | | 3 | | | | | | | | | | | | 3 |
| Aurobindo | 17 | 5 | 3 | 15 | 8 | 10 | 7 | 7 | 6 | 6 | | | 5 | 89 |
| Citron | | | | 3 | 3 | 3 | | 1 | | 1 | | 1 | | 12 |
| DRL | 2 | | | | | | | | | 2 | 1 | 3 | 6 | 14 |
| Glenmark | 7 | 8 | 1 | 17 | 18 | 21 | 5 | 4 | 2 | | 3 | | 8 | 94 |
| Heritage | 7 | 10 | | | | | | 5 | 5 | 3 | | 1 | 5 | 36 |
| Lannett | | | | | | | | | 16 | 13 | | 1 | 13 | 43 |
| Mayne | 2 | | 2 | 1 | 1 | 2 | 4 | 5 | | | | 7 | | 24 |
| Mylan | 28 | 22 | 2 | 7 | | 12 | 6 | 1 | 1 | 1 | 7 | 1 | | 88 |
| Par | 0 | | 4 | 4 | 3 | 16 | 1 | 18 | 6 | 9 | 11 | 14 | 3 | 89 |
| Sandoz | 3 | 5 | 3 | | | | 7 | | 2 | 3 | | 1 | | 24 |
| Sun | | | | 2 | | 1 | | | | 1 | | | 2 | 6 |
| Zydus | 75 | 29 | 25 | 203 | 43 | 48 | 20 | 39 | 46 | 35 | 41 | 14 | 20 | 638 |
| | | | | | | | | | | | | | | 1501 |

54.     Defendant manufacturers actively monitor and track each other's ██████ of generic drugs, and discuss it with each other in the context of agreements on specific drugs.

55.     There is no precise method for apportioning each participant's ██████ of sales of a particular generic drug because market share is obtained by winning the business of various customers, which is inherently variable in a given year. The shared understanding and goal, instead, is for the competitors in a particular market to reach out to each other with the

REDACTED PURSUANT TO PROTECTIVE ORDER

expectation that they would be able to reach an agreement on ███████ based on the industry understanding of customer allocation. The objective is to attain a state of equilibrium, where none are incentivized to compete for additional market share by eroding price.

56.     This scheme to minimize competition and allocate ███████ is implemented in different ways. First, Defendants allocate the market for an individual drug based on the number of competitors and the timing of their entry so that each competitor obtains an acceptable share of the market. Then, the competitors agree on ways to avoid competition on price and, at times, raise price.

57.     Evidence of the larger conspiracy often presents itself as follows: When a competitor needs to obtain one or more customers to reach its ███████, a competitor with more than its ███████ will identify and "walk away" from a customer or customers by informing them of a significant price increase. The competitor looking to increase its share will then submit an above-competitive bid at an amount slightly less than the original competitor. The competitors then continue to divide up customers until they reach an artificial equilibrium. This is referred to as a "stable" market. Once the market is "stable," the competitors agree not to compete on price and, at times, significantly raise prices in the absence of competition.

58.     This understanding regarding ███████ has been particularly effective when a new competitor enters the market – a time when, in a free-functioning competitive market, prices should go down. In today's generic drug markets, a new competitor will either approach or be approached by the existing competitors. Existing competitors will agree to "walk away" from specific customers until the market reaches a new artificial equilibrium. The new competitor's transition into the market is seamless; the new entrant obtains market share and immediately charges above-competitive price.

59.     Decisions on ███████████ can, at times, be based on conduct that occurs between competitors across more than one generic drug market. To maintain the artificial equilibrium, customers in one drug market might be traded for customers in another drug market in an effort to arrive at a more global ███████ outcome. Alternatively, competitors might allow price increases on one or more generic drugs without competing based on a *quid pro quo* from other competitors on different drugs.

60.     For example, when Defendant Heritage was preparing to launch a formulation of the generic drug Zoledronic Acid that was about to come off patent, its ██████████████ ████████████████ , spoke to Dr. Reddy's ████████████████████████████ ████████████████████████████████ After speaking with ████ , ████ stated that ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████

61.     Similarly, Defendant Rajiv Malik, the President of Mylan, told the CEO of Heritage that Mylan would ██████████ as Heritage entered the Doxy DR market and agreed that Mylan would give up two large accounts to Heritage. Malik specifically cited Heritage's prior agreement to allow Mylan to enter the market for another drug without competition as a reason that Mylan would cede share to Heritage in this instance.

62.     When a generic manufacturer complies with the scheme, and prices remain high, it is viewed as ████████████████████████ For example, in December 2014 Defendant Teva was approached by a customer on behalf of one of Teva's competitors. The large retail customer indicated that Teva's competitor was entering the market for a particular drug not identified in this complaint and was seeking to target specific customers. The customer specifically requested

that Teva give up a specific large customer to the new entrant, and indicated that the new entrant – Teva's competitor – ████████████████████████ After discussing the matter internally, a Teva representative responded to the customer: ████████████████████ ████████████████████████████████████

63.     This pattern is frequently followed even in the absence of direct communication between the competitors, demonstrating the universal understanding and code of conduct agreed to by Defendants. ████████ and ████████████████ have become part of the industry lexicon, and part of the larger understanding among Defendants. Defendants use these terms not only in discussions with each other in order to reach agreement regarding allocation of market share and pricing, but also with their customers.

64.     These rules about ████████ apply equally to price increases. As long as everyone ████████████████, and the manufacturers believe that they have their ████ ████ the larger understanding dictates that they will not seek to compete or take advantage of a competitor's price increase by bidding a lower price to take that business. Doing so is viewed as "punishing" a competitor for raising prices – which is against the rules.

65.     The agreement among Defendant manufacturers to adhere to the rules regarding ████████ is critical in order to maintain high prices. If even one competitor is not aware of (and behaving in accordance with) the larger understanding, it can lead to unwanted competition and lower prices. In the relatively few instances where a competitor prioritizes gaining market share over the larger understanding of maintaining ████████, that competitor is viewed as "irresponsible," and is spoken to by competitors.

66.     In furtherance of this broader, overarching agreement, Defendants and other generic drug manufacturers routinely communicate and share information with each other about

REDACTED PURSUANT TO PROTECTIVE ORDER

bids and pricing strategy. This includes forwarding bid packages received from a customer (e.g., a Request for Proposal or "RFP") to a competitor, either on their own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that information.

67.     Defendants and other generic drug manufacturers also share information among themselves regarding the terms of their contracts with customers, including pricing terms, price protection and rebates. Defendants use this information to negotiate prices or terms that are more favorable to them, often to the ultimate detriment of consumers.

## **Generic Drug Price Spikes Since 2013**

68.     Against this industry backdrop, the prices for a large number of generic pharmaceutical drugs skyrocketed throughout 2013 and 2014. According to one report, "[t]he prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and July 2014."

69.     A January 2014 survey of 1,000 members of the National Community Pharmacists Association ("NCPA") found that more than 75% of the pharmacists surveyed reported higher prices on more than 25 generic drugs, with the prices spiking by 600% to 2,000% in some cases.

70.     More than $500 million of Medicaid drug reimbursement during the twelve months ending on June 30, 2014 was for generic drugs whose prices had increased by over 100%.

71.     When entering a generic drug market, Defendant manufacturers routinely seek out their competitors in an effort to reach agreement to allocate market share, maintain high prices and/or avoid competing on price. These agreements had the effect of artificially maintaining high

REDACTED PURSUANT TO PROTECTIVE ORDER

prices for a large number of generic drugs and creating an appearance of competition where in fact little to none existed.

## MCKESSON COOPERATES WITH, AND HELPS
## CONCEAL, THE CONSPIRACY

72.    As they await the Court's rulings on pending discovery motions, private plaintiffs have not had access to the millions of documents discovered by the State Attorneys General over several years, particularly in this context those produced by McKesson (and documents from other Defendants relating to McKesson) which may reveal direct evidence of McKesson's knowledge of the conspiracy and (a) its express or tacit cooperation with the conspiracy; and (b) its concealment of the conspiracy. Further, because of McKesson's ███████████████ with Defendant Heritage (as well as the movement of its senior officers back and forth between the central conspirators Mylan and Teva) discovery from these Defendants (including discovery from Heritage's two officers pleading guilty to two felony counts) may also cast light on explicit, direct evidence of McKesson cooperation with, and concealment of, the conspiracy to allow it to generate billions in additional margins on generic drug sales.

73.    At this stage of Marion's and the State Attorneys General's investigations, however, strong circumstantial evidence of McKesson's cooperation to aid and conceal the industry-wide conspiracy is highly plausible. *Infra* ¶ 123. McKesson is certainly strongly motivated financially to cooperate with, and conceal, the conspiracy. The conspiracy's enormous, unlawful inflation of pricing across the generic drug industry has generated billions of dollars of additional McKesson margin each year since at least 2013 (given its routine percentage mark ups of above-competitive pricing). The more pricing exceeds competitive levels across the industry, the more McKesson benefits by billions of dollars.

REDACTED PURSUANT TO PROTECTIVE ORDER

## McKesson Has Been Aware of the Industry-Wide
## Conspiracy Lasting Several Years

74.     As the sixth largest corporation in America, with $11 billion in profits annually across all its entire distribution, in 2017 McKesson realized $153.8 billion in revenues from distribution of brand and generic drugs alone, and is the largest United States drug distributor by a significant margin.[13] Consistent with a report of the Generic Pharmaceutical Association approximately 88% of these revenues, or approximately $135 billion, are generated by generic drug distribution. *See supra* ¶ 35. McKesson is the largest United States distributor of generic drugs and the most substantial, high-volume customer with which Defendant manufacturers have dealt as they make their market allocations and fix prices.

75.     Based on years of investigation, the State Attorneys General plausibly allege with great specificity that Defendant manufactures have unlawfully allocated customers (including McKesson) among themselves as far back as 2012. SAG Complt. ¶¶ 113-242.

76.     Since McKesson bids and purchases approximately *$135 billion in generic drugs each year*, most of them from Defendant manufacturers, it has a very sophisticated buying operation pervasively covering the generic drug industry.

77.     Numerous, sophisticated McKesson purchasing personnel can hardly have failed to notice that, for a number of years, bidding for McKesson's high-volume, attractive business for numerous generic drugs has been much less than robust and fully-competitive (because its business has been allocated to one of the Defendant manufacturers so that the manufacturer could obtain its agreed ███████ of a particular drug).

---

[13] http://www.mdm.com/2017-top-pharmaceuticals-distributors.

REDACTED PURSUANT TO PROTECTIVE ORDER

78.     Further, the same numerous McKesson's buying personnel can hardly have failed to notice, as well, the radical Defendant price spikes paid by McKesson in 2013 and 2014 for more than 1,200 generic medications (where prices increased on average 448 percent between July 2013 and July 2014). *See supra* ¶ 68.

79.     It is also highly plausible that McKesson's many buying operatives faced with diminished competitive bidding by Defendant manufacturers, and unexpected, dramatic price hikes, across billions of dollars of annual McKesson purchases sought to learn why price and supply competition for its desirable, very high-volume business has not been robust across the board. They must have been become aware that the only plausible explanation was anticompetitive conduct by Defendant manufacturers. There is no other reasonable explanation for the lack of aggressive competitive bidding on McKesson's very attractive, high-volume business. There had been no significant and general increases in costs, no significant decreases in supply, and no significant increases in demand contributing to sharp price increases across the board; and no pro-competitive reason for the lack of competitive bidding for McKesson's attractive, high-volume business.

80.     As a consequence, it is highly plausible that McKesson has been aware for years of the industry-wide conspiracy driving pricing of more than 1,200 generic medications to above-competitive levels between July 2013 and July 2014.

81.     The conspiracy's price explosions and market allocations are centrally coordinated in part by Defendant Heritage (and two of its officers who have pled guilty to felonies) and Heritage claims to be closely ███████████ with McKesson. Thus McKesson has a ready, close source of intelligence to confirm any suspicions of anticompetitive activity, and its whys and wherefores.

82.     Further, any McKesson inquiries at the many "cozy" trade shows over several years used to facilitate the overarching conspiracy (some of which were sponsored all or in part by McKesson) plausibly are sources of intelligence as to anticompetitive conduct. *See supra* ¶ 49; *Infra* ¶¶ 120-122; SAG Complt. ¶¶ 76-88.

83.     Thus over the several years during which McKesson purchased hundreds of billions of dollars of generic drugs it is highly plausible it has been aware of an overarching conspiracy keeping prices at above-competitive levels and diminishing bidding for its business, and has tacitly or explicitly cooperated with it (and concealed it) in order to keep reaping billions more in margins it would not realize if the pricing of generic drugs were competitive.

### *McKesson Has Been Aware of the Conspiracy Given Its* ███████ ██████ *with Central Conspirator Heritage*

84.     McKesson's cooperation with, and concealment of, the massive, long-term conspiracy is also highly plausible given its close relationship with co-conspirators Heritage and two of its senior executives Glazer and Malek (who have pled guilty to market allocation and price fixing felonies). *See supra* ¶ 44.

85.     Heritage has told at least one other Defendant manufacturer, Mayne/Mithlothian, that it should not bid on McKesson business because McKesson was ████████████████ with Heritage. SAG Complt. ¶ 226.

86.     Indeed, Heritage protected its close McKesson relationship by ceding substantial market share to Defendant Mayne for the sale of Doxy DR only if the latter rescinded its pending, lower-priced bid to McKesson, telling Mayne that it was doing so to protect its ███████████████ with Heritage. *Id.* ¶¶ 230-238.

REDACTED PURSUANT TO PROTECTIVE ORDER

### *Movement of Knowledgeable Officers Among McKesson and Central Conspirators Mylan and Teva Facilitates McKesson's Collusion*

87.    **Movement from Central Conspirator Mylan to McKesson**. In addition to McKesson's ▮▮▮▮▮▮▮▮▮ with central conspirator Heritage, the movement of officers between McKesson and additional central conspirators Mylan and Teva has further facilitated its cooperation with, and concealment of, the overarching conspiracy.

88.    Like Heritage, Mylan has been ensnared in the Department of Justice's criminal investigation. It has received a grand jury subpoena "seeking information relating to the marketing, pricing, and sale of our generic Doxycycline products and any communications with competitors about such products." *Supra* ¶ 46.   It also has been subpoenaed by the Attorney General of the State of Connecticut. It disclosed in a SEC quarterly report that both it and "certain employees and senior management, received subpoenas from DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products and any communications with competitors about such products." Mylan also disclosed that "[r]elated search warrants also were executed" in connection with the Department of Justice's investigation. *Id*.

89.    In addition, the amended SAG Complaint alleges that Mylan has advanced collusion fix prices and to allocate markets in five discrete instances across the generic drug industry. *Supra* ¶ 51.  In 2013-2014 alone, the period of enormous industry-wide price hikes, the SAGs also identify at least 18 texts or phone calls between Heritage and Mylan and 88 texts or phone calls between Mylan and Teva.  *Supra* ¶ 52.

90.    At least seven officers have moved between Mylan and McKesson in the recent past and have provided McKesson with ready avenues to facilitate its cooperation with, and concealment of, the conspiracy.

REDACTED PURSUANT TO PROTECTIVE ORDER

91.     Indeed, current senior McKesson officers have a history of long-term service to central conspirator Mylan.

92.     Terry Pierce is currently the McKesson Senior Director for Government Reporting. He served as Senior Manager, Government Pricing and Reporting and Manager Government Pricing and Reporting at Mylan from 2010 through 2017, that is, during several years of the industry-wide collusion. He was with Mylan during the massive, market-wide spike in the pricing of generic pharmaceuticals in 2013 through-2014 (supra ¶¶ 68-70), as well as when Mylan was participating in multiple instances of collusion to fix prices and allocate markets. *Supra* ¶ 51. He likely carried his intimate knowledge of the overarching conspiracy with him to McKesson.

93.     Ed Langill is Vice President for National Accounts at McKesson Canada. He served during Mylan's participation in the 2013 and 2014 price hikes as Mylan's Senior Director Corporate Accounts, Director Corporate Accounts (between 2012 and 2018) and was likely aware of his employer's collusion.

94.     VaiDehi Kannan is the Director Finance for Pharmaceutical Solutions at McKesson Canada. From 2009-2010 he was Finance Manager at Mylan.  He also provides McKesson another ready window into Mylan's participation in the overarching conspiracy.

95.     Christopher Hilleary is a McKesson Director for Physical and Electronic Security Programs. From 2008 through 2017, once again during the price-spike period, he served as Mylan's Director for Global Product Security, as well as a Product Development Scale-Up Technician where he performed all pharmaceutical manufacturing processes for new Mylan products and likely had knowledge of the company's pricing of those products.

REDACTED PURSUANT TO PROTECTIVE ORDER

96.     **Movement of McKesson Officers to Central Conspirator Mylan.** The close corporate affinity between McKesson and Mylan has been deepened with the movement of at least three senior McKesson officers to Mylan.

97.     Just after he left McKesson (after eight years of service), Adam Huang became the Director of Financial Planning and Analysis at Mylan from 2014 through 2017. At McKesson he had had served in part as a Senior Manager for Financial Planning and Analysis between 2006 and 2014. Thus those in McKesson finance department curious about the cause of the 2013-2014 industry-wide price spikes (dramatically increasing McKesson's bill for generic drugs) had a ready source of information at a central conspirator.

98.     Preeti Churbock is Mylan's current Director of Marketing for Dermatology. He served as a McKesson Product Manager for the eleven years between 2006 and 2017. He also provides McKesson a ready source of information as to the conspiratorial machinations.

99.     Another McKesson potential source is Heather Paton, Vice President of Sales at Mylan. She had been Vice President of Marketing for Health Systems at McKesson for the thirteen years between 1990 and 2003.

100.     **Movement of McKesson Officers to Central Conspirator Teva.** Like Mylan, Teva is one of the largest manufactures participating in the overarching conspiracy, as well as a large seller of generic pharmaceuticals to McKesson.

101.     The amended SAG complaint alleges that Teva has conspired to allocate markets in seven separate instances. *Supra* ¶ 51.  It also alleges that, during the period of radical price spikes in 2013 to 2014, Teva exchanged at least 1501 texts and phone calls with other conspiring manufacturers. With Heritage and Mylan, two central conspirators particularly close to

McKesson, Teva exchanged during this period at least 36 and 88 texts and phone calls respectively.

102.    McKesson's collusion is also facilitated by the movement of McKesson senior officers to this third central conspirator.

103.    Armen Tekeriam is a Vice President at Teva who served as Director/Vice President at McKesson for eight years. (1992-2000).

104.    Laurie Hughes is Teva's Vice President for U.S. Patient Solutions. She served as a Senior Vice President at McKesson for two years (1997-1999).

**Follow the Money: McKesson's Has Made Billions in Additional Margin by Conspiratorial Cooperation and Concealment**

105.    McKesson collusion is also highly probable if one follows the money.

106.    According to an analysis performed for the University of Southern California's Leonard D. Schaeffer Center for Health Policy and Economics, distributors typically retain as revenue approximately $8 of every $100 spent by their customers on generic drugs (contrasted to only $1 for every $100 spent on branded drugs).[14]

107.    Thus McKesson plausibly retains on its generic drug sales eight times as much as realizes on its brand sales.

108.    Much of this differential is explained by the dramatic, positive effect on McKesson's bottom line due to sales of generic drugs at the conspiracy's very high, unlawful prices.

_____

[14] Healthpolicy.usc.edu/documents/USC%20Schaeffer_Flow%20of%20Money_2017.pdf

REDACTED PURSUANT TO PROTECTIVE ORDER

109.    The State Attorneys General allege that large distributors such as McKesson "actually benefit when [generic] prices are higher,"[15] which McKesson has admitted in its 2014, 2015, 2016, 2017, and 2018 10-Ks, filed with the SEC (available at http://investor.mckesson.com/sec-filings):

> A significant portion of our distribution arrangements with the manufacturers provides us compensation based on a percentage of our purchases. In addition, we have certain distribution arrangements with pharmaceutical manufacturers that include an inflation-based compensation component whereby *we benefit when the manufacturers increase their prices* as we sell our existing inventory at the new higher prices. *For these manufacturers, a reduction in the frequency and magnitude of price increases*, as well as restrictions in the amount of inventory available to us, *could have a material adverse impact on our gross profit margin*.[16]

110.    Each year McKesson buys approximately $135 billion in generic drugs (*supra* ¶ 74) largely from Defendant manufacturers. An 8% margin on this business translates into

---

[15] SAG Complt. ¶¶ 71-73.

[16] Nor is McKesson alone in admitting that it makes more money when generic drug prices rise. AmerisourceBergen Corporation, for example, admitted in its 2014 10-K (*Available at:* http://investor.amerisourcebergen.com/static-files/432a3225-53cb-4bf2-ba10-6e904103cfe6) that:

> Our results of operations continue to be subject to the risks and uncertainties of inflation in branded and generic pharmaceutical prices and deflation in generic pharmaceutical prices.

> Certain distribution service agreements that we have entered into with branded and generic pharmaceutical manufacturers continue to have an inflation-based compensation component to them.

> Arrangements with a small number of branded manufacturers continue to be solely inflation-based. As a result, our gross profit from brand-name and generic manufacturers continues to be subject to fluctuation based upon the timing and extent of manufacturer price increases. *If the frequency or rate of branded and generic pharmaceutical price increases slows, our results of operations could be adversely affected.* In addition, generic pharmaceuticals are also subject to price deflation. If the frequency or rate of generic pharmaceutical price deflation accelerates, our results of operations could be adversely affected (emphasis supplied).

REDACTED PURSUANT TO PROTECTIVE ORDER

approximately a $10.8 billion total margin (typically generated by marking up by fixed percentages the conspiracy's above-competitive pricing). The higher the conspiracy's market-wide pricing the higher McKesson's margins.

111.    If McKesson were making brand sales (on pricing not inflated by a conspiracy), the its total margin on $135 billion in annual sales would be approximately $1.35 billion, not the $10.8 billion it makes on generic drug sales. Much of this over nine billion in additional McKesson margin enjoyed on generics is enabled by high conspiracy pricing. And this is for one year alone during a conspiracy of several years duration.

112.    These additional billions realized by McKesson annually are powerful reasons why it has cooperated with, and concealed, several years of conspiracy, a conspiracy often centrally orchestrated by its ████████████ partner Heritage.

113.    Marion contends that it is likely that, after complete discovery from McKesson's and Heritage's emails and files, as well as those of other Defendant manufacturers, there will be direct evidence of McKesson's cooperation and concealment. However, only circumstantial evidence of tacit McKesson cooperation and concealment is sufficient as a matter of law plausibly to allege McKesson as a co-conspirator. *Infra* ¶ 104 (parallel conduct and plus factors).


**A Knowledgeable Industry Analyst Concludes that McKesson (and Other Large Distributors) Have Not Found It in Their Interest to "Keep in Check" the Conspiracy's Pricing**

114.    Consistent with McKesson's SEC admissions that it benefits from higher, not lower, pricing of generic drugs, Ronny Gal, a market analyst for Sanford Bernstein, told National Public Radio ("NPR") in March 2018, that in an efficient, competitive marketplace, *generic drug wholesalers and distributors should have kept generic drug prices in check, and that "[i]n a*

REDACTED PURSUANT TO PROTECTIVE ORDER

*market that has only three or four really large distribution organizations, they are sometimes tempted to maximize their own profits in a way that does not always 100 percent reflect the best interest of their clients.*"[17]

### SAG Allegation Is Consistent with McKesson Conspiratorial Cooperation

115.    The State Attorneys General suggest that Defendant manufacturers across the generic industry may have enlisted distributor co-conspirators to cooperate with the overarching conspiracy:

> *Drug suppliers* can include the [generic] manufacturers themselves, or *other companies that have agreements to sell or distribute* certain generic pharmaceutical drugs manufactured by another company. The Defendants in this action are all drug manufacturers *and suppliers* who compete with one another for the sale of generic pharmaceutical drugs which are ultimately sold to consumers in the United States.[18]

116.    Further, in addressing "the cozy nature of the [generic] industry and opportunities for collusion" the attorneys general also allege that "[m]any customers of the Defendants, including but not limited to … large wholesalers or distributors like [Amerisource Bergen], Cardinal, HD Smith, McKesson and Morris & Dickson…hold multi-day conferences throughout the year in various locations throughout the United States. Generic manufacturers [alleged to be Defendants] from across the United States are invited to attend."[19]

117.    As reported by *The Connecticut Mirror*, in January 2017 the Connecticut Attorney General, who has taken the lead in the states' investigation, "suspected fraud on a

---

[17] Charles Lane, "Probe Into Generic Drug Pricing Set to Widen," Mar. 7, 2018, (emphasis supplied) *available at* https://www.npr.org/2018/03/07/590217561/probe-into-generic-drug-price-fixing-set-to-widen.

[18] SAG Complt. ¶ 58 (emphasis supplied).

[19] *See id.* ¶ 77.

REDACTED PURSUANT TO PROTECTIVE ORDER

broader, nearly unimaginable scale" and "new subpoenas are going out, and the investigation is growing beyond the companies named in the suit."[20] Attorney General Jepsen has called evidence obtained by the states' investigation "mind-boggling."[21]

### Connecticut Is Reportedly Investigating McKesson
### And Other Large Distributors

118.    In a report entitled *Probe Into Generic Drug Pricing Set to Widen,* NPR in March of 2018 cites representations by the Assistant Attorney General for Antitrust for the State of Connecticut, the state leading the State Attorney General investigation, to the effect that McKesson and other distributor participation in the overarching conspiracy "is what investigators [for the state attorneys general] are looking at now." In this article NPR also reports that "[t]he state attorneys general] in their complaint… suggest  – but don't allege – *that the price fixing conspiracy has also involved drug distributors*. Prosecutors are sending out more subpoenas and planning a new complaint."[22]

119.    According to NPR as of March 2018 McKesson had received requests for information from prosecutors and was cooperating with their investigation.[23]

### McKesson Sponsored Meetings Have Facilitated
### McKesson's Cooperation with the Conspiracy

120.    The industry intelligence-gathering firm *Policy and Regulatory Report* has obtained information regarding the investigation of generic drug companies by DOJ, and reports that DOJ is investigating the extent to which trade associations and industry conferences have

---

[20] Mark Pazniokas, *How a small-state AG's office plays in the big leagues*, The Connecticut Mirror (Jan. 27, 2017), *available at* https://ctmirror.org/2017/01/27/how-a-small- state-ags-office-plays-in-the-big-leagues/.

[21] *Id.*

[22] *Id.*

[23] *Id.*

REDACTED PURSUANT TO PROTECTIVE ORDER

been used as forums for collusion among conspirators.[24]  State Attorneys General similarly have noted the centrality of trade associations and industry conferences in their investigation stating that they have uncovered evidence that certain generic drug companies "routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events, as well as through direct email, phone, and text message communications."[25] Defendants have been members of numerous such trade associations.

121.   The Healthcare Distribution Alliance ("HDA") (formerly known as the Healthcare Distribution Management Association) is a national trade association that represents "primary pharmaceutical distributors" including McKesson and links the nation's drug manufacturers and more than 200,000 pharmacies, hospitals, clinics, long-term care facilities, and clinics.[26] The HDA holds regular conferences where its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry.

122.   The Association for Accessible Medicines (formerly known as the GPhA)[27] is the "nation's leading trade association for manufacturers and distributors of generic prescription drugs. . . ."[28] GPhA was formed in 2000 from the merger of three industry trade associations: the

---

[24] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, FIERCEPHARMA (Aug. 7, 2015), *available at* https://www.fiercepharma.com/regulatory/actavis-gets-subpoena-as-doj-probe-of-generic-pricing-moves-up-food-chain.

[25] CTAG Website, Press Release, *Connecticut Leads 20 State Coalition Filing Federal Antitrust Lawsuit against Heritage Pharmaceuticals, other Generic Drug Companies* (Dec. 15, 2016), *available at* https://portal.ct.gov/AG/Press-Releases/2016-Press-Releases/Connecticut-Leads-20-State-Coalition-Filing-Federal-Antitrust-Lawsuit-against-Heritage-Pharmaceutica.

[26] HDA, About, *available at* https://www.healthcaredistribution.org/about.

[27] *See* Russell Redman, *New name for Generic Pharmaceutical Association*, CHAIN DRUG REVIEW (Feb. 14, 2017), *available at* http://www.chaindrugreview.com/new-name-for-generic-pharmaceutical-association/.

[28] GPhA, Membership, *available at* http://web.archive.org/web/20150413013008/http:

REDACTED PURSUANT TO PROTECTIVE ORDER

Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance. Its website touts that "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[29] GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

### In Return for Billions of Dollars of Additional Annual Margin, McKesson Has Participated as a Tacit Co-Conspirator at the Very Least

123.     Without discovery as to direct evidence that McKesson has cooperated with, and concealed, the overarching conspiracy, the preceding allegation nonetheless raises more than a plausible suggestion that McKesson has conspired. There is far more than merely parallel conduct by McKesson and the Defendant manufacturers. Multiple plus factors plausibly suggest their meeting of the minds. This gives rise to the reasonably-founded hope that discovery will produce additional circumstantial evidence, as well as direct evidence, of McKesson's role as a co-conspirator. First, McKesson has made each year (since at least 2013) billions of dollars of additional margins on its resale of generic drugs due to is routine percentage mark-up of the conspiracy's above-competitive pricing. *Supra* ¶¶ 87-92. This strongly suggests why it has acted contrary to its independent, rational economic self-interest (in favor of the purchase of product on competitive terms and conditions) by continually accepting large, unlawful price increases and submitting to reduced bidding for its very attractive, volume business in exchange for greatly

---

//www.gphaonline.org:80/about/membership.

[29] *Id.*

REDACTED PURSUANT TO PROTECTIVE ORDER

increased margins. Second, it has continued to purchase billions of dollars of generic drugs annually at vastly increased pricing (and observed reduced manufacturer bidding) without seeking remedy. Its purchasing executives must have known that these observed circumstances were not consistent with the operation of a free and open market. Thus McKesson has acted contrary to its independent, rational economic self-interest in favor of the purchase of product on competitive terms and conditions, and cooperated with, and concealed, the conspiracy. Third, over the years McKesson, as the largest distributor of generic pharmaceuticals, attended numerous meetings with Defendant manufacturers where it plausibly learned of collusion, cooperated with it, and concealed its existence. *See supra* ¶¶ 120-122. Fourth, Heritage (and its felonious senior officers) have admitted that they had a close ████████████ with McKesson providing McKesson with another open avenue to learn of, and advance, the conspiracy. *See supra* ¶¶ 84-86. In addition, the movement of senior officers back and forth between McKesson and central conspirators Mylan and Teva has greatly facilitated McKesson's collusion. *Supra* ¶¶ 87-104.

## CLASS ACTION ALLEGATIONS

### Class of Direct Purchasers From Conspirator McKesson

124.    Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), Plaintiffs bring this action on behalf of a Class defined as:

> All persons or entities that have directly purchased generic drugs from conspirator McKesson in the United States from September 25, 2014 through the present ("Class Period") ("Class of Direct Purchasers from Conspirator McKesson").

REDACTED PURSUANT TO PROTECTIVE ORDER

**Rule 23(a) Prerequisites**

125.    Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)    Members of the Class are so numerous that joinder is impracticable. Plaintiffs believe that there are hundreds of Class members such that joinder of all Class members is impracticable. Joinder also is impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class Representatives' lack of knowledge of the identity and addresses of all members of the Class (although Plaintiffs believe that information is discoverable from information and records maintained by defendants).

(b)    There are numerous questions of law and fact arising from the pattern of conspirators' conduct which are common to the members of the Class.  These include, but are not limited to, common issues as to (1) whether defendants have conspired to eliminate competition and thereby increase the prices of generic drugs in the United States; (2) the duration and extent of the conspiracy alleged; (3) whether defendants have been participants in the conspiracy; (4) the effect of the conspiracy on the prices of generic drugs during the damage period; (5) whether defendants' conduct has caused above-competitive prices for generic drugs; (6) whether, and to what extent, the conduct of defendants has caused antitrust price injury to Plaintiffs and other members of the Class; and (7) whether defendants' conduct was a *per se* violation of s Section 1 of the Sherman Act, 15 U.S.C. § 1.

(c)    The claims of the Class Representatives are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class.  The Class Representatives and the members of the Class are similarly or identically harmed by the same systematic and anticompetitive conduct by Defendants.

REDACTED PURSUANT TO PROTECTIVE ORDER

(d)    The Class Representatives and their counsel will fairly and adequately protect the interests of the members of the Class.  There are no material conflicts between the claims of the Class Representatives and the members of the Class that would make class certification inappropriate. Counsel for the Class are experienced and competent in the prosecution of class action antitrust litigation, and will vigorously assert the claims of the Class Representatives and the other members of the Class.

## Rule 23(b)(3) Prerequisites

126.    Prosecution of the claims of the Class as a class action is appropriate under Rule 23(b)(3) because:

(a)    Questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members;

(b)    A class action is superior to other methods for the fair and efficient resolution of the controversy; and

## Rule 23(b)(2) Prerequisites

127.    Prosecution of the claims of the Class is appropriate under Rule 23(b)2) because the conspirators have acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

## ANTITRUST INJURY

128.    During the Class Period, Defendants have sold substantial quantities of generic drugs in a continuous and uninterrupted flow of interstate commerce to purchasers throughout the United States.

REDACTED PURSUANT TO PROTECTIVE ORDER

129.    During the Class Period, Class members have directly purchased generic drugs from the conspiracy from co-conspirator McKesson. Competition has been harmed because they have been forced to pay above-competitive pricing materially caused by an overarching conspiracy across the generic drug industry. As a consequence they have suffered antitrust price injury and substantial damages.

130.    Each  Defendant has joint and several liability without right of contribution for the damages inflicted on the Class by the overarching conspiracy.

## STANDING

131.    Members of the proposed Class have purchased directly from the conspiracy through Defendant McKesson as co-conspirator. As a consequence they have constitutional standing and statutory standing under Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a) to pursue damages inflicted by the conspiracy.

## COUNT I

### Restraint of Trade
### (Section 1 of the Sherman Act)

132.    All foregoing paragraphs are incorporated herein by reference.

133.    Defendant conspirators have engaged in unlawful price fixing and market allocation constituting *per se* violations under Section 1 of the Sherman Act, 15 U.S.C. § 1.

134.    This conspiracy restrains trade in interstate commerce across the generic drug industry.

135.    Members of the proposed Class purchasing directly from the conspiracy through co-conspirator McKesson have paid above-competitive prices for generic drugs and have suffered actual antitrust damages. Plaintiffs are entitled to damage and injunctive relief pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26

## SUPPLEMENTAL JURISDICTION

136.    Plaintiffs are entitled to damage and injunctive relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

137.    All the foregoing paragraphs are incorporated herein by reference.

138.    Should this Court not find standing under Count I for federal damage claims, Plaintiffs allege in the alternative that Defendant conspirators have engaged in unlawful price fixing and market allocation constituting *per se* violations under the state laws alleged below ("Indirect Purchaser Jurisdictions").

### Indirect-Purchaser Healthcare Class

139.    These claims are prosecuted in the alternative by a an Indirect-Purchaser Healthcare Class under Fed. R. Civ. P. 23(a) and 23(b)(3) encompassing:

> All United States healthcare providers purchasing the generic drugs of Defendant manufacturers through distributors and wholesalers from September 25, 2014 through the present ("Class Period"). "Healthcare providers" include without limitation hospitals, medical or diagnostic clinics, outpatient centers, long-term care facilities, and surgery centers. They do not include pharmacies operated by private or public corporations, insurance companies, or pension plans purchasing generic drugs.
>
> The class is organized into sub-classes according to the Indirect-Purchaser Jurisdiction specified below.

### Rule 23(a) Prerequisites

140.    Prosecution of the claims of the Class and its Sub-Classes as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)     The number of persons in the Class and is in the thousands, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable.

REDACTED PURSUANT TO PROTECTIVE ORDER

Joinder also is impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class Representative's lack of knowledge of the identity and addresses of all members of the Class.

(b)    There are numerous questions of law and fact arising from the pattern of conspirators' restraint of trade which are common to the members of the Class. These include, but are not limited to, common issues as to (1) whether the Defendants have engaged in restraint of trade in the Indirect Purchaser Jurisdictions; and (2) whether this conduct, taken as a whole, has materially caused antitrust price injury to be inflicted indirectly on members of the Class.

141.    The claims of the Class Representatives are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class. The Class Representatives and the members of the Class are similarly or identically harmed by the same systematic and pervasive concerted action.

142.    The Class Representatives and the Representatives' counsel will fairly and adequately protect the interests of the members of the Class. There are no material conflicts between the claims of each Class Representative and the members of the Class that would make class certification inappropriate. Counsel for the Class will vigorously assert the claims of the Class Representatives and the other members of the Class.

## Rule 23(b)(3) Prerequisites

143.    In addition, the prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(3) is appropriate because:

(a)    Questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

REDACTED PURSUANT TO PROTECTIVE ORDER

(b)     A class action is superior to other methods for the fair and efficient resolution of the controversy.

## COUNT II

### Alabama

144.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code. Defendants' conspiracy has had the following effects: (1) competition for the sale of generic pharmaceuticals to Alabama healthcare providers was restrained throughout Alabama; (2) prices were fixed at above-competitive levels throughout Alabama; (3) members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for generic pharmaceuticals due to the pass on by resellers of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation. Accordingly, Plaintiffs and members of the Indirect-Purchaser Class seek all forms of relief available under Alabama Code § 6-5-60, et seq.

## COUNT III

### Arizona

145.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes.. Defendants' conspiracy has had the following effects: (1) competition for the sale of generic pharmaceuticals in Arizona to healthcare providers restrained

REDACTED PURSUANT TO PROTECTIVE ORDER

throughout Arizona; (2) prices were fixed at above-competitive levels throughout Arizona; (3) members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for generic pharmaceuticals due to the pass on by the resellers of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. Defendants have restrained trade. Accordingly, Plaintiffs and members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under Arizona Revised Statutes, § 44-1401, *et seq*.

## COUNT IV

## California

146. Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 *et seq*. During the Class Period, Defendants and their unnamed co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants have acted in violation of § 16720 to fix the prices in the sale of generic pharmaceuticals at above-competitive levels. This violation of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their unnamed co-conspirators, the substantial terms of which were to fix prices. Defendants' conspiracy has had the following effects: (1) competition for the sale of generic pharmaceuticals is restrained throughout California; (2) prices were fixed at above-competitive

levels throughout California; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for generic pharmaceuticals due to the pass on by resellers of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

## COUNT V

### District of Columbia

147.    Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code. Defendants' conspiracy has had the following effects: (1) competition in the sale of generic pharmaceuticals to District of Columbia healthcare providers was restrained throughout District of Columbia; (2) prices were fixed at above-competitive levels throughout District of Columbia; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for generic pharmaceuticals due to the pass on by resellers of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially

REDACTED PURSUANT TO PROTECTIVE ORDER

affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under District of Columbia Code Annotated § 28-4501, *et seq.*

## COUNT VI

### Hawaii

148.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Hawaii Code Revised Statutes. Defendants' conspiracy has had the following effects: (1) competition in the sale of generic pharmaceuticals to Hawaii healthcare providers was restrained throughout Hawaii; (2) prices were fixed at above-competitive levels throughout Hawaii; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for due to the pass on by resellers of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under Hawaii Revised Statutes Annotated § 480-1, *et seq.*

REDACTED PURSUANT TO PROTECTIVE ORDER

## COUNT VII

### Illinois

149.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Illinois Code Antitrust Act. Defendants' conspiracy has had the following effects: (1) competition in the sale of generic pharmaceuticals to Illinois healthcare providers was restrained throughout Illinois; (2) prices were fixed at above-competitive levels throughout Illinois; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices due to the pass on by resellers of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Indirect-Purchase Healthcare Class seek all forms of relief available under the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, *et seq*.).

## COUNT VIII

### Iowa

150.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code. Defendants' conspiracy has had the following effects: (1) competition in the sale of generic pharmaceuticals to Iowa healthcare providers was restrained throughout Iowa; (2) prices were fixed at above-competitive levels throughout Iowa; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-

REDACTED PURSUANT TO PROTECTIVE ORDER

competitive prices due to the pass on by resellers of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under Iowa Code § 553.1, *et seq*.

## COUNT IX

## Kansas

151.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated. Defendants' conspiracy has had the following effects: (1) competition in the sale of generic pharmaceuticals to Kansas healthcare providers was restrained throughout Kansas; (2) prices were fixed at above-competitive levels throughout Kansas; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for generic pharmaceuticals provided by Kansas healthcare providers due to the pass on by the practices of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade. Accordingly, Plaintiffs and

REDACTED PURSUANT TO PROTECTIVE ORDER

members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under Kansas Statutes Annotated, § 50-101, *et seq*.

## COUNT X

### Maine

152.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes. Defendants' conspiracy has had the following effects: (1) competition in the sale of generic pharmaceuticals to Maine healthcare providers was restrained throughout Maine; (2) prices were fixed at above-competitive levels throughout Maine; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for generic pharmaceuticals provided by Maine healthcare providers due to the pass on by resellers of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, *et seq*.)

## COUNT XI

### Michigan

153.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated. Defendants' conspiracy has had the following

REDACTED PURSUANT TO PROTECTIVE ORDER

effects: (1) competition for the sale of generic pharmaceuticals to Michigan healthcare providers was restrained throughout Michigan; (2) prices were fixed at above-competitive levels throughout Michigan; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for generic pharmaceuticals provided by Michigan to healthcare providers due to the pass on by resellers of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under Michigan Compiled Laws Annotated § 445.771, *et seq.*

## COUNT XII

### Minnesota

154.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes. Defendants' conspiracy has had the following effects: (1) competition for the sale of generic pharmaceuticals to Minnesota healthcare providers throughout Minnesota; (2) prices were fixed at above-competitive levels throughout Minnesota; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices due to the pass on by resellers of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal

REDACTED PURSUANT TO PROTECTIVE ORDER

conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchase Healthcare Class seek all forms of relief available under Minnesota Annotated Statutes § 325D.49, *et seq*.

## COUNT XIII

### Mississippi

155.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated. Defendants' conspiracy has had the following effects: (1) competition in the sale of generic pharmaceuticals to Mississippi healthcare providers was restrained throughout Mississippi; (2) prices were fixed at above-competitive levels throughout Mississippi; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for generic pharmaceuticals provided by Mississippi resellers due to the pass on by them of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under Mississippi Code Annotated § 75-21-1, *et seq*.

REDACTED PURSUANT TO PROTECTIVE ORDER

## COUNT XIV

### Nebraska

156.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes. Defendants' conspiracy has had the following effects: (1) competition for the sale of generic pharmaceuticals Alabama healthcare providers was restrained throughout Nebraska; (2) prices were fixed at above-competitive levels throughout Nebraska; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for generic pharmaceuticals provided by Nebraska resellers due to the pass on by the practices of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under Nebraska Revised Statutes § 59-801, *et seq*.

## COUNT XV

### Nevada

157.    Defendants have entered into an unlawful agreement in restraint of trade in violation of  Nevada Revised Statutes Annotated. Defendants' conspiracy has had the following effects: (1) competition in the sale of generic pharmaceuticals to Nevada healthcare providers was restrained throughout Nevada; (2) prices were fixed at above-competitive levels throughout

REDACTED PURSUANT TO PROTECTIVE ORDER

Nevada; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for generic pharmaceuticals provided by Nevada resellers due to the pass on by the resellers of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchase Healthcare Class seek all forms of relief available under Nevada Revised Statutes Annotated § 598A.010, *et seq.*

## COUNT XVI

### New Hampshire

158.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes. Defendants' conspiracy has had the following effects: (1) competition in the sale of generic pharmaceuticals to New Hampshire healthcare providers was restrained throughout New Hampshire; (2) prices were fixed at above-competitive levels throughout New Hampshire; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for generic pharmaceuticals provided by New Hampshire resellers due to their pass on of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a direct and proximate result of

REDACTED PURSUANT TO PROTECTIVE ORDER

Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under New Hampshire Revised Statutes § 356:1, *et seq.*

## COUNT XVII

### New Mexico

159.     Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated. Defendants' conspiracy has had the following effects: (1) competition in the sale of generic pharmaceuticals to New Mexico healthcare providers was restrained throughout New Mexico; (2) prices were fixed at above-competitive levels throughout New Mexico; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for generic pharmaceuticals provided by New Mexico resellers due to their pass on of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under New Mexico Statutes Annotated § 57-1-1, *et seq.*

REDACTED PURSUANT TO PROTECTIVE ORDER

## COUNT XVIII

### New York

160.    Defendants have entered into an unlawful agreement in restraint of trade in violation of New York's Donnelly Act. Defendants' conspiracy has had the following effects: (1) competition in the sale of generic pharmaceuticals to New York healthcare providers was restrained throughout New York; (2) prices were fixed at above-competitive levels throughout New York; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Damage Class indirectly paid above-competitive prices for generic pharmaceuticals provided by New York resellers due to their pass on by the practices of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under New York's Donnelly Act, New York General Business Law § 340, *et seq*.

## COUNT XIX

### North Carolina

161.    Defendants have entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes. Defendants' conspiracy has had the following effects: (1) competition in the sale of generic pharmaceuticals to North Carolina healthcare

REDACTED PURSUANT TO PROTECTIVE ORDER

providers was restrained throughout North Carolina; (2) prices were fixed at above-competitive levels throughout North Carolina; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Damage Class indirectly paid above-competitive prices for generic pharmaceuticals provided by North Carolina resellers due to their pass on of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under North Carolina General Statutes § 75-1, *et seq.*

## COUNT XX

## North Dakota

162.    Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code. Defendants' conspiracy has had the following effects: (1) competition in the sale of generic pharmaceuticals to North Dakota healthcare providers was restrained throughout North Dakota; (2) prices were fixed at above-competitive levels throughout North Dakota; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for generic pharmaceuticals provided by North Dakota resellers due to their pass on of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct

substantially affected North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under North Dakota Century Code § 51-08.1-01, *et seq.*

## COUNT XXI

## Oregon

163.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes. Defendants' conspiracy has had the following effects: (1) competition in the sale of generic pharmaceuticals to Oregon healthcare providers was restrained throughout Oregon; (2) prices were fixed at above-competitive levels throughout Oregon; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for generic pharmaceuticals provided by Oregon resellers due to their pass on of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under Oregon Revised Statutes § 646.705, *et seq.*

REDACTED PURSUANT TO PROTECTIVE ORDER

## COUNT XXII

### Rhode Island

164.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Rhode Island Antitrust Act. Defendants' conspiracy has had the following effects: (1) competition in the sale of generic pharmaceuticals to Rhode Island healthcare providers was restrained throughout Rhode Island; (2) prices were fixed at above-competitive levels throughout Rhode Island; (3) Plaintiffs and members of the Indirect-Purchaser Damage Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for generic pharmaceuticals provided by Rhode Island resellers due to their pass on by the practices of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, *et seq*.

## COUNT XXIII

### South Dakota

165.   Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Law. Defendants' conspiracy has had the following effects: (1) competition in the sale of generic pharmaceuticals to South Dakota healthcare providers was restrained throughout South Dakota; (2) prices were fixed at above-competitive levels

REDACTED PURSUANT TO PROTECTIVE ORDER

throughout South Dakota; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for generic pharmaceuticals provided by South Dakota resellers due to their pass on by the practices of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under South Dakota Codified Laws § 37-1-3.1, *et seq.*

## COUNT XXIV

### Tennessee

166.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated. Defendants' conspiracy has had the following effects: (1) competition in the sale of generic pharmaceuticals to Tennessee healthcare providers was restrained throughout Tennessee; (2) prices were fixed at above-competitive levels throughout Tennessee; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for generic pharmaceuticals provided by Tennessee resellers due to their pass on of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce. As a direct and proximate result of Defendants' unlawful

REDACTED PURSUANT TO PROTECTIVE ORDER

conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under Tennessee Code Annotated § 47-25-101, *et seq*.

## COUNT XXV

### Utah

167.    Defendants have entered into an unlawful agreement in restraint of trade  in violation of Utah Code Annotated. Defendants' conspiracy has had the following effects: (1) competition in the sale of generic pharmaceuticals to Utah healthcare providers was restrained throughout Alabama; (2) prices were fixed at above-competitive levels throughout Utah; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for generic pharmaceuticals provided by Utah resellers due to their pass on by their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under Utah Code Annotated § 76-10-3101, *et seq*.

REDACTED PURSUANT TO PROTECTIVE ORDER

## COUNT XXVI

### Vermont

168.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Statutes Annotated. Defendants' conspiracy has had the following effects: (1) competition in the sale of generic pharmaceuticals to Vermont healthcare providers was restrained throughout Vermont; (2) prices were fixed at above-competitive levels throughout Vermont; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for generic pharmaceuticals provided by Vermont resellers due to their pass on of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under Vermont Stat. Ann. 9 § 2453, *et seq*.

## COUNT XXVII

### West Virginia

169.    Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code Code. Defendants' conspiracy has had the following effects: (1) competition in the sale of generic pharmaceuticals to West Virginia healthcare providers was restrained throughout West Virginia; (2) prices were fixed at above-competitive levels

REDACTED PURSUANT TO PROTECTIVE ORDER

throughout West Virginia; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for generic pharmaceuticals provided by West Virginia resellers due to their pass on of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under West Virginia Code § 47-18-1, *et seq*.

## COUNT XXVIII

### Wisconsin

170.   Defendants have entered into an unlawful agreement in restraint of trade in violation of Wisconsin Statutes. Defendants' conspiracy has had the following effects: (1) competition for the sale of generic pharmaceuticals to Wisconsin healthcare providers was restrained throughout Wisconsin; (2) prices were fixed at above-competitive levels throughout Wisconsin; (3) Plaintiffs and members of the Indirect-Purchaser Healthcare Class were deprived of free and open competition; and (4) Plaintiffs and members of the Indirect-Purchaser Healthcare Class indirectly paid above-competitive prices for generic pharmaceuticals provided by Wisconsin resellers due to their pass on of their antitrust price injury materially caused by Defendants' conspiracy. During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Indirect-Purchaser Healthcare Class have been injured in

REDACTED PURSUANT TO PROTECTIVE ORDER

their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade. Accordingly, Plaintiffs and members of the Indirect-Purchaser Healthcare Class seek all forms of relief available under Wisconsin Statutes § 133.01, *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs individually and as members of the proposed Class alleged pray that:

A.      This Court declare that Defendants' conduct constitutes a *per se* violation of the Sherman Act, 15 U.S.C. §1, and award treble damages and injunctive relief to the proposed Class under Sections 4 and 16 of the of the Clayton Act., 15 U.S.C. §§15, 26;

B.      In the alternative, this Court declare that Defendants' conduct constitutes a *per se* restraint of trade in violation of each of the relevant statutes of the Indirect-Purchaser Jurisdictions, and award damages and injunctive to the proposed Class as permitted by state law;

C.      Plaintiffs recover reasonable attorneys' fees and costs as allowed by law;

D.      Plaintiffs recover pre-judgment and post-judgment interest at the highest rate allowed by law; and

E.      Plaintiffs be granted such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury.

REDACTED PURSUANT TO PROTECTIVE ORDER

Dated: December 21, 2018

Respectfully submitted,

**Whatley Kallas LLP**
Henry C. Quillen
159 Middle St., Suite 2C
Portsmouth, NH 03801
Telephone: (603) 294-1591
Facsimile: (800) 922-4851
hquillen@whatleykallas.com

**Whatley Kallas LLP**
Joe R. Whatley, Jr.
Edith M. Kallas
1180 Avenue of the Americas, 20th Floor
New York, NY 10036
Telephone: (212) 447-7060
Facsimile: (800) 922-4851
jwhatley@whatleykallas.com
ekallas@whatleykallas.com

**Berry Law PLLC**
R. Stephen Berry
P.A. Bar No. 22418
1100 Connecticut Avenue, N.W.
Suite 645
Washington, D.C. 20006
Telephone: (202) 296-3020
Facsimile: (202) 296-3038
sberry@berrylawpllc.com

**Attorneys for Plaintiffs**

REDACTED PURSUANT TO PROTECTIVE ORDER