# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724<br>HON. CYNTHIA M. RUFE |
| THIS DOCUMENT RELATES TO: | ORAL ARGUMENT REQUESTED |
| *The State of Connecticut, et al. v. Actavis Holdco U.S., Inc., et al.* | 17-CV-03768 |
| *The Kroger Co., et al. v. Actavis Holdco U.S., Inc., et al.* | 18-CV-00284 |
| *1199SEIU National Benefit Fund, et al. v. Actavis Holdco U.S., Inc., et al.* | 18-CV-02401 |
| *West Val Pharmacy, et al. v. Actavis Holdco U.S., Inc., et al.* | 18-CV-02533 |
| *Humana Inc. v. Actavis Elizabeth, LLC, et al.* | 18-CV-03299 |
| *Marion Diagnostic Center, LLC, et al. v. McKesson Corporation, et al.* | 18-CV-04137 |

**DEFENDANT MAYNE PHARMA INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION UNDER FRCP 12(b)(6) TO DISMISS VARIOUS PLAINTIFFS' SO-CALLED "OVERARCHING CONSPIRACY" COMPLAINTS**

# **TABLE OF CONTENTS**

Table of Authorities .................................................................................................................... iii

Introduction ....................................................................................................................................1

Plaintiffs' Extraordinarily Limited Allegations Against Mayne .....................................................3

Argument ........................................................................................................................................4

    A.  Standard Of Review ..........................................................................................................4

    B.  The Law On Conspiracy ...................................................................................................4

    C.  The Complaints Contain No Factual Allegations To Support A Claim That Mayne Participated In Any Conspiracy Related To Doxycycline .......................................5

        1.    All Claims as to Doxy RR and Doxy Mono Should be Dismissed Against Mayne ......................................................................................................6

        2.    There Are No Factual Allegations Supporting a Doxy DR Conspiracy with Mylan .....................................................................................6

        3.    There Are No Factual Allegations Supporting a Doxy DR Conspiracy with Heritage ..................................................................................8

    D.  The Complaints Contain No Factual Allegations To Support A Claim That Mayne Participated In Any So-Called "Overarching Conspiracy" ...................................12

Conclusion ....................................................................................................................................15

## **TABLE OF AUTHORITIES**

**Cases**     **Page(s)**

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................. 1, 3, 6, 8, 11

*Brunson Commc'ns, Inc. v. Arbitron, Inc.*,
    239 F. Supp. 2d 550 (E.D. Pa. 2002) ........................................................................... 5

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011) ......................................................................................... 9

*Finkelman v. Nat'l Football League*,
    810 F.3d 187 (3d Cir. 2016) .................................................................................... 8, 11

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999) .......................................................................................... 9

*In re Chocolate Confectionary Antitrust Litig.*,
    801 F.3d 383 (3d Cir. 2015) .......................................................................................... 9

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) .......................................................................................... 7

*In re K-Dur Antitrust Litig.*,
    No. 01-cv-1652, 2016 WL 755623 (D.N.J. Feb. 25, 2016) ........................................ 7

*In re Processed Egg Prods. Antitrust Litig.*,
    821 F. Supp. 2d 709 (E.D. Pa. 2011) ........................................................................... 8

*InterVest, Inc. v. Bloomberg, L.P.*,
    340 F.3d 144 (3d Cir. 2003) .......................................................................................... 9

*Kotteakos, et al. v. United States*,
    328 U.S. 750 (1946) ....................................................................................................... 8

*United States v. Kelly*,
    892 F.2d 255 (3d Cir. 1989) .......................................................................................... 5

*United States v. Kemp*,
    500 F.3d 257 (3d Cir. 2007) .......................................................................................... 5

*United States v. Yehling*,
    456 F.3d 1236 (10th Cir. 2006) .................................................................................... 5

Pursuant to Pretrial Orders 61 and 71 (ECF 775, 846) and Federal Rule of Civil Procedure 12(b)(6), Defendant Mayne Pharma Inc. ("Mayne") moves this Court to dismiss the federal Sherman Act claims against Mayne in various Plaintiffs' so-called "overarching conspiracy" complaints.[1]

## **INTRODUCTION**

The Supreme Court has instructed that District Courts "must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed," and must not "forget that proceeding to antitrust discovery can be expensive," as the "costs of modern federal antitrust litigation . . . counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (internal citations and quotations omitted). This directive was intended to protect defendants like Mayne—a small company, against which Plaintiffs have pleaded no substantive factual allegations of an anticompetitive agreement, and for whom the "inevitably costly and protracted discovery phase" of this ever-expanding antitrust case will be both unjustified and substantially burdensome if allowed to proceed. *Id.* (internal citation omitted).

Across all of the Multi-Drug Complaints, Plaintiffs' factual allegations specific to Mayne are extremely limited. The State CAC—the complaint on which all Plaintiffs' allegations are wholly based—alleges (1) that Mayne manufactured and sold **only one** of the dozens of generic drugs at issue in this MDL, and (2) that **one** Mayne employee communicated with **one** employee

---

[1] Mayne moves to dismiss the claims in the following complaints: *The State of Connecticut, et al. v. Actavis Holdco U.S., Inc., et al.* (17-CV-03768, ECF 15) ("State CAC"); *The Kroger Co., et al. v. Actavis Holdco U.S., Inc., et al.* (18-CV-00284, ECF 37) ("Kroger Complaint"); *1199SEIU National Benefit Fund, et al. v. Actavis Holdco U.S., Inc., et al.* (18-CV-02401, ECF 2) ("EPP Complaint"); *West Val Pharmacy, et al. v. Actavis Holdco U.S., Inc., et al.* (18-CV-02533, ECF 4) ("IRP Complaint"); *Humana Inc. v. Actavis Elizabeth, LLC, et al.* (18-CV-03299, ECF 30) ("Humana Complaint"); *Marion Diagnostic Center, LLC, et al. v. McKesson Corporation, et al.* (18-CV-04137, ECF 23) ("Marion Complaint") (collectively, "Multi-Drug Complaints" or "Complaints").

from **one** other Defendant, Heritage, and that these communications concerned—at most—*only four* specific customers. The Complaints do not allege that Mayne communicated with *any other Defendant about any other drug*, nor that Mayne's alleged communications with Heritage extended beyond the four specific customers alleged in the Complaints.

Nevertheless, by means of wholly conclusory statements and sweeping generalizations, the Complaints seek to hold Mayne responsible for various formulations of a so-called "overarching conspiracy" alleged to involve:

- between at least fifteen (15) or as many as forty (40) generic drugs, each of which must be approved by the FDA to treat specific and distinct diseases and medical conditions, and for which the manufacture and sale of each is highly-regulated; and,

- between at least sixteen (16) or as many as three dozen or more (36+) Defendants, and which allegedly operated across the entire generic drug industry for the purposes of either (1) allocating specific generic drug markets or (2) price-fixing the at-issue generic drugs.

But beyond their conclusory allegations, Plaintiffs plead *no substantive facts* that Mayne knew of, contributed to, or participated in any type of so-called "overarching conspiracy."

Mayne should not be subjected to the financial and reputational costs, nor the threat of joint and several liability, of massive antitrust litigation based on allegations that are either wholly conclusory or that allege—at most—an *attempted* anticompetitive agreement with *only one* other Defendant, involving *only one* drug, and focused on *only four* customers. This Court must engage in a rigorous review of the allegations relating to Mayne, and must demand more than unsupported and conclusory statements to justify Mayne's continued subjection to litigation likely to last a half-decade. And even if the Court concludes that Plaintiffs have sufficiently pleaded a limited, single-drug Doxy DR conspiracy between Mayne and Heritage—which Mayne does not concede—this Court must exert its authority to prevent Plaintiffs from expanding and exaggerating weak and limited single-drug allegations into claims of an industry-

wide conspiracy in an effort to compel settlements through both the threat of joint and several liability and the high costs and business disruption inherent to antitrust cases. Such is exactly the type of unjustified litigation that *Twombly* warns against and legally precludes. Thus, this Court must not permit Plaintiffs to pursue claims against Mayne that are well beyond the extraordinarily limited factual allegations contained in the Complaints. Because Plaintiffs fail to plead any substantive factual allegations supporting Mayne's participation in *any* conspiracy, all claims against Mayne should be dismissed.[2]

**PLAINTIFFS' EXTRAORDINARILY LIMITED ALLEGATIONS AGAINST MAYNE**[3]

The Complaints' substantive factual allegations against Mayne are extremely limited: Mayne manufactured and sold only **one drug**—doxycycline hyclate delayed-release ("Doxy DR") and was the last manufacturer to enter the Doxy DR market. Plaintiffs plead no allegations that Mayne had any involvement whatsoever *with any other generic drug*, including other forms of doxycycline. Accordingly, Plaintiffs' factual allegations against Mayne focus solely on Mayne's sales and marketing of Doxy DR and purported communications with only one other Defendant—Heritage—as to Doxy DR. Plaintiffs do <u>not</u> allege that Mayne and Heritage agreed to allocate the Doxy DR market, nor that Mayne and Heritage agreed to fix the price of Doxy DR. Instead, Plaintiffs allege communications between Mayne and Heritage regarding the sale of Doxy DR to a total of four customers during three specific limited periods of time. *See* Section C.3 *supra*. A rigorous review of these allegations—at most—reveals claims of an *attempted* (but

---

[2] Mayne incorporates by reference the arguments of its co-Defendants in jointly and individually moving to dismiss the Complaints. *See* Defendants' Memorandum of Law In Support of Their Motion to Dismiss Plaintiffs' Overarching Conspiracy Claims ("Defendants' Joint Motion").

[3] Given the page-limitations of Pretrial Order 71 (ECF 846), Mayne elects to cite and respond principally to the allegations in the States' Complaint, both because the allegations therein are the most detailed and specific, and because the allegations in the other Complaints cite to, align with, and are wholly derived from the State CAC. To the extent the Court permits claims against Mayne to proceed based on allegations not in the State CAC but specific to another Multi-Drug Complaint, Mayne expressly reserves its right to move to dismiss those claims pursuant to its Due Process rights under the 5th and 14th Amendments of the United States Constitution.

not consummated) agreement to allocate *specific* Doxy DR *customers* but not market share.

Plaintiffs plead no other substantive factual allegations against Mayne. The remaining allegations against Mayne are wholly conclusory and without factual support. For example, Plaintiffs allege that all "Defendants routinely and as part of their regular course of business, [formed] agreements with competitors to fix and raise prices," State CAC ¶ 243, but Plaintiffs fail to plead any specific facts that Mayne engaged in any conduct to "fix and raise prices." Plaintiffs also allege that all Defendants formed "agreements . . . to allocate markets to avoid price competition," *id.* ¶ 90, but Plaintiffs fail to plead any specific facts that Mayne engaged in any conduct to "allocate markets." Instead, the Complaints advance the argument that Mayne's purported Doxy DR "agreement" with Heritage "was part of an overarching conspiracy . . . to unreasonably restrain trade in the [entire] generic drug industry." *Id.* ¶ 242. But Plaintiffs plead no specific facts that Mayne engaged in, knew of, committed to, or depended upon anticompetitive conduct related to any other Defendant or any other generic drug. Such "specificity in pleading" simply does not exist in the Complaints.

For the reasons set forth below, Plaintiffs' allegations are insufficient to support Mayne's participation in *any* conspiracy—overarching or even specific to Doxy DR—alleged in the Complaints. Accordingly, the claims against Mayne should be dismissed.

## ARGUMENT

### A. Standard of Review

To avoid redundancy, Mayne incorporates by reference, as if fully set forth herein, the standard of review case law in Defendants' Joint Motion, *passim*.

### B. The Law On Conspiracy Governs This Court's Review of the Complaints

To support a claim for conspiracy, Plaintiffs are required to establish: "(1) two or more

persons agreed to violate the law, (2) the defendant knew the essential objectives of the conspiracy, (3) the defendant knowingly and voluntarily participated in the conspiracy, **and** (4) the alleged conspirators were interdependent." *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006). Courts have consistently affirmed the principle that, without demonstrating interdependence amongst alleged co-conspirators, plaintiffs cannot prove that a defendant engaged in a larger conspiratorial scheme. *See United States v. Kemp*, 500 F.3d 257, 288-291 (3d Cir. 2007) (holding that no single conspiracy existed because no defendant "depended upon, was aided by, or had any interest in the success of the others"). To determine whether allegations related to disparate facts and events can plausibly state a claim of a single, broad, unified conspiracy, Plaintiffs must allege sufficient facts to support a showing that: (1) "there was a common goal among the [alleged] conspirators"; (2) the alleged conspirators depended on each other and the "continuous cooperation of the conspirators" to further their common goal; **and** (3) "the extent to which the participants overlap in the various dealings" that further their common goal. *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989). And where allegations of anticompetitive conduct are conclusory, "devoid of details" and fail to "provide[] a single detail as to when, why, or how the conspirators decided upon this alleged [scheme]," the complaint fails as a matter of law. *Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 563 (E.D. Pa. 2002). Because the Complaints are barren of any factual allegations that Mayne formed *any* agreement that satisfies these basic elements of conspiracy—much less that Mayne knew of, participated in, or depended upon a vast "overarching conspiracy"—the claims against Mayne should be dismissed.

    **C.    The Complaints Contain No Factual Allegations To Support A Claim That Mayne Participated In Any Conspiracy Related To Doxycycline**

All of Plaintiffs' claims—both as to alleged drug-specific and purported "overarching"

conspiracies—depend upon the allegations that Mayne participated in a conspiracy as to the sale of Doxy DR, the only generic drug on which Mayne is alleged to have conspired. But for the reasons set forth below, Plaintiffs fail to sufficiently plead Mayne's participation in a Doxy DR conspiracy.

1. <u>All Claims As to Doxy RR and Doxy Mono Should Be Dismissed Against Mayne</u>

Mayne specifically asserts that it cannot be held liable for any claims related to doxycycline monohydrate ("Doxy Mono") or doxycycline hyclate regular-release ("Doxy RR").[4] There are no allegations that Mayne manufactured, sold, distributed, or marketed Doxy Mono or Doxy RR, nor are there any allegations that Mayne communicated—much less conspired—with any of the Defendants who sold either product. This Court has already concluded that the DPPs, EPPs, and IRPs failed to plead direct or circumstantial evidence of a Doxy RR conspiracy involving Mayne. *See* ECF 721 at 40-64. Because of that Opinion, and because Plaintiffs fail to allege even the basic elements of conspiracy between Mayne and the Defendants who manufactured and sold Doxy RR and Doxy Mono, any and all claims against Mayne related to these separate generic drug products should be dismissed. *See Twombly*, 550 U.S. at 557.

2. <u>There Are No Factual Allegations Supporting a Doxy DR Conspiracy with Mylan</u>

Plaintiffs do not allege any facts suggesting a conspiracy between Mayne and Mylan related to Doxy DR. To the contrary, the only specific allegations of any conduct between Mayne and Mylan in the Complaints are that (1) Mayne made an "unsolicited bid for the Doxy DR business" of a wholesaler for which Mylan was the incumbent supplier, State CAC ¶ 212, and then (2) Mayne *continued* to "*target*" Mylan's Doxy DR market share, resulting in Mylan

---

[4] Only certain Plaintiffs attempt to assert claims against Mayne related to Doxy Mono and/or Doxy RR. The States specifically *exclude* Doxy RR from their complaint, and specifically *exclude* Mayne from their Doxy Mono allegations. State CAC ¶¶ 180-242, 246-267. The EPPs and IRPs erroneously conflate Doxy RR and Doxy DR as "doxycycline," while Kroger and Humana compound this mistake even further by conflating Doxy RR, Doxy DR, and Doxy Mono as "doxycycline." *See* Kroger Compl. ¶¶ 34, 55, 914-921; *see* Humana Compl. ¶¶ 28, 99, 1157-67.

defending its accounts and *retaining* its business. *Id.* at ¶¶ 219-20, 224 (emphasis added).

While the Complaints contain allegations of agreements related to Doxy DR between <u>Mayne and Heritage</u>, and <u>Heritage and Mylan</u>, respectively, Plaintiffs fail to allege that Mayne knew of any alleged agreement between Heritage and Mylan, or that Mylan knew of any alleged agreement between Heritage and Mayne. Indeed, the State Plaintiffs—on whose allegations all other Complaints are wholly based—explicitly *exclude* Mayne from their alleged "Heritage/Mylan Agreement" as to Doxy DR.[5] Most importantly, the Complaints fail to allege that Mayne and Mylan depended on each other to achieve some common goal related to Doxy DR. In fact, the allegation that Mayne "target[ed] Mylan" customers and made an "unsolicited bid" for a Doxy DR account for which Mylan was the incumbent supplier demonstrates that Mayne and Mylan were acting independently to achieve their own legitimate business goals. *Id*. at ¶¶ 212, 219-20.

Courts have repeatedly refused to find the existence of a single conspiracy where the complaint alleges a defendant's connection to a common conspiratorial player absent evidence tying the defendant to the larger conspiracy. *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327 (3d. Cir. 2010); *see also In re K-Dur Antitrust Litig.*, 2016 WL 755623 at *18 (D.N.J. Feb. 25, 2016) ("For a single conspiracy to exist, the parties . . . must have been aware of the existence of [each other], and . . . must have done something in furtherance of a single, illegal endeavor."). Here, Plaintiffs fail to allege any common goal between Mayne, Heritage, and Mylan. Similarly, Plaintiffs fail to allege that the success of Mayne's alleged agreements with

---

[5] The State Plaintiffs have repeatedly stated that they have not pleaded an agreement between Mayne and Mylan. *See* ECF 312 at 30, n.19 (16-cv-02056) (D. Conn.) (The States "confirm . . . Mayne's observation that the Amended Complaint ***alleges separate agreements*** between Mylan and Heritage, and Mayne and Heritage. [And thus] . . . an agreement linking Mylan and Mayne concerning Doxy DR has not been pled at this time.") (emphasis added). The States' factual allegations as to Mayne have not changed since their initial complaint, and the States' current operative complaint is even more explicit in distinguishing between the alleged "Heritage/Mylan" and "Heritage/Mayne" agreements, plead as wholly <u>separate</u> and <u>distinct</u> allegations and counts.

Heritage in any way affected or depended upon the success of Heritage's alleged agreements with Mylan. This factual scenario is precisely the type of situation in which the Supreme Court refused to find that a party engaged in a single, overarching conspiracy. *See Kotteakos, et al. v. United States*, 328 U.S. 750 (1946) (allegations of a defendant conspiring with one player do not demonstrate that the defendant engaged in a larger conspiratorial agreement). For these reasons, Plaintiffs' allegations are insufficient to state a conspiracy claim between Mayne and Mylan.[6]

        3.    <u>There Are No Factual Allegations Supporting a Doxy DR Conspiracy with Heritage</u>

Plaintiffs' claims of a conspiracy between Mayne and Heritage fail as a matter of law because there are no factual allegations that plausibly suggest collusion. For Sherman Act claims, the "crucial question" is "whether the challenged anticompetitive conduct stems from independent decision or from an agreement." *Twombly*, 550 U.S. at 553 (citations and internal quotations omitted). Under *Twombly* and its progeny, Plaintiffs cannot escape dismissal by alleging similar conduct among the defendants and asking the court to infer that the only explanation is a conspiracy. *See Finkelman v. Nat'l Football League*, 810 F.3d 187, 201 (3d Cir. 2016) (explaining plaintiffs in *Twombly* "looked around and saw conduct *consistent* with conspiracy, but [alleged] no facts that indicated more plausibly that a conspiracy actually existed.") (emphasis in original). Instead, the complaint must "delineate[] to some sufficiently specific degree" that each defendant "purposefully joined and participated in the conspiracy." *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 720 (E.D. Pa. 2011). Here, the Complaints fail to suggest that the alleged conduct in the Doxy DR market was the product of

---

[6] This Court previously concluded that the DPPs, EPPs, and IRPs "plausibly alleged the existence of a Doxy DR conspiracy [between Heritage, Mylan, and Mayne] based on direct evidence" of former Heritage employees' guilty pleas related to a Doxy DR conspiracy. ECF 721 at 44 (16-md-02724). Because criminal guilty pleas—neither of which in this case identify Mayne as a co-conspirator or detail any factual statements supporting that conclusion—do not constitute "direct evidence" in the Third Circuit, Mayne expressly reserves its right to move for reconsideration and/or leave to file an interlocutory appeal of that Order. *See* Section C.3 *supra*.

8

collusion as opposed to Mayne's and Heritage's unilateral decision-making.

Plaintiffs must allege facts that constitute either direct or circumstantial evidence of a conspiracy. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011). Because Plaintiffs plead no "parallel conduct" by Mayne, they must rely on direct evidence to support their allegations of conspiracy. Direct evidence of a conspiracy is "an explicit admission from a participant than an antitrust conspiracy existed," *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 396 (3d Cir. 2015), and "requires no inferences to establish the proposition or conclusion being asserted." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999). The paradigmatic example of such evidence is a recorded phone call featuring an agreement to fix prices. *See InterVest, Inc. v. Bloomberg*, L.P., 340 F.3d 144, 162-63 (3d Cir. 2003) (providing examples of direct evidence such as "a memorandum produced by a defendant conspirator detailing the discussions from a meeting of a group of alleged conspirators"). The Complaint here contains nothing of the sort as it relates to an alleged conspiracy between Mayne and Heritage. Plaintiffs do not identify a single meeting, phone call, document, or text message in which Mayne formed an explicit unlawful agreement with its competitors regarding Doxy DR. Instead, Plaintiffs make a series of allegations of specific, sometimes verbatim, conversations between representatives from Mayne and Heritage—none of which amount to an agreement and many of which actually show that Mayne was competing vigorously for Doxy DR market share—and then make conclusory allegations that the companies reached "agreements." *See* State CAC ¶¶ 236, 238-42. As explained in detail below, none of these allegations amount to direct evidence of a conspiracy between Mayne and Heritage.

<u>February–April 2014</u> (State CAC ¶¶ 218-27): The Complaints first allege that in January 2014, Mayne approached Heritage "to discuss its plans" about entering the Doxy DR market.

9

¶ 218. Plaintiffs do not allege that Mayne and Heritage agreed to allocate market share, and the Complaints are notably silent on any details of the alleged conversation, and do not allege that it was in any way improper. The Complaints then allege Mayne avoided bidding on Heritage customers when Mayne entered the Doxy DR Market. ¶ 219. Plaintiffs allege that over this two-month period, a Mayne employee ("ME") and a Heritage employee ("HE") "continued to communicate . . . about Doxy DR," ¶ 220, but Plaintiffs fail to allege any *agreement* between Mayne and Heritage. Instead, the Complaint (1) cites alleged internal Mayne communications noting Mayne's intent to compete against Heritage for Doxy DR business, ¶ 219; (2) details alleged internal Heritage communications about how to respond to Mayne's repeated bids to both Heritage and Mylan customers, ¶¶ 220-24; and (3) alleges that Mayne *targeted* Doxy DR customers of both Mylan and Heritage. ¶¶ 219-20, 222-25. Plaintiffs provide few details regarding the nature and substance of the alleged communications between ME and HE, other than to allege that Mayne shared with Heritage which customers to whom it had or would bid for Doxy DR business. ¶¶ 220, 223, 225. The Complaints make no allegations of an exchange of Doxy DR pricing information or any agreement on which customers would receive bids from whom. Stripped of the conclusory allegations that Mayne and Heritage allocated market share and Mayne avoided bidding on Heritage's customers, the Complaints here merely allege facts consistent with Mayne competing vigorously for market share and fails to allege an agreement between Heritage and Mayne.

<u>November 2014–January 2015</u> (State CAC ¶ 228-38): The Complaints next allege that, in November 2014, Mayne again submitted bids to two Heritage Doxy DR customers, McKesson and Econdisc. ¶ 228. Plaintiffs allege that, in response to this competitive challenge, Heritage made a "formal offer" to Mayne that if Mayne would agree to withdraw its McKesson bid, then

10

Heritage would allow Mayne to win Heritage's Econdisc accounts.[7] ¶ 234. The Complaints allege that M.E. and H.E. discussed Heritage's alleged offer on two occasions, but Plaintiffs fail to allege Mayne's response to Heritage's alleged offer. ¶¶ 235-37. Plaintiffs allege that in January 2015, Heritage "bid a higher price than Mayne" to Econdisc to allow Mayne the business, but the Complaints make no allegation that Mayne (1) "fulfilled its end" of the alleged agreement and withdrew its McKesson bid, (2) agreed to not price Doxy DR aggressively, or (3) exchanged bid information with Heritage so as to be able to "ma[k]e sure that [Heritage] bid a higher price than Mayne." ¶¶ 234-38. Thus, Plaintiffs allege no agreement between Heritage and Mayne. In short, Plaintiffs make no factual allegation that Heritage's alleged "offer" was ever effectuated by the companies. As a result, the Complaints fail to allege with any level of specificity that Mayne and Heritage actually reached an agreement. Instead, the Complaints—stripped of the conclusory statements that Plaintiffs inject into the allegations—merely allege that Heritage's bid to Econdisc was higher than Mayne's. As alleged, Plaintiffs' theory of the conspiracy—that Heritage, an established seller of Doxy DR, simply walked away from business because Mayne, a new market participant, asked it to—is simply implausible and insufficient to support a claim of conspiracy against Mayne. *See Finkelman*, 810 F.3d at 201 (explaining plaintiffs in *Twombly* "looked around and saw conduct *consistent* with conspiracy, but [alleged] no facts that indicated more plausibly that a conspiracy actually existed.") (emphasis in original). Plaintiffs offer no specific factual allegations that would contradict the presumption that Heritage's higher bid was anything other than Heritage's independent business decision.

---

[7] The State CAC—the States' *third* version of their Complaint—omits ***exculpatory evidence*** that the States had ***included*** in their original complaints. See ECF 168 at ¶ 94 (16-cv-02056) (D. Conn.): A Heritage employee "floated the idea that Heritage may be willing to walk from Econdisc ***if Mayne would agree not to price Doxy DR aggressively***, **and** if Mayne would also agree to withdraw its offer to McKesson." (emphasis added) Thus, Heritage's "formal offer" to Mayne actually had ***two conditions***, to which no Plaintiffs allege that Mayne agreed. Moreover, the States' attempt to scrub from their own complaint evidence of Mayne aggressively pricing Doxy DR to compete against Heritage and Mylan is a direct violation of the States' ethical responsibilities and is sanctionable.

11

September 2015 Allegations (State CAC ¶ 239-40): Lastly, the Complaints allege that—in September 2015—Heritage was approached by one of Mayne's customers "requesting a bid on Doxy DR." ¶ 239. Plaintiffs allege that Heritage communicated with Mayne through text messages, that Mayne confirmed that it had "no supply issues," and that Heritage then "refused to provide a bid" because Mayne and Heritage had an alleged agreement "not to compete with each other and avoid price erosion." ¶ 240. Here, Plaintiffs again fail to allege any specific facts pointing to the formation of an alleged agreement, and instead continue to rely on the conclusory statements in ¶¶ 228-38 as evidence of an alleged ongoing "agreement." Moreover, for this September 2015 allegation, the Complaints merely allege that Mayne, in response to an inquiry from Heritage, conveyed that it "had no supply issues" and believed that the large nationwide pharmacy chain "was simply shopping for a better price." ¶ 240. Plaintiffs do not allege that Mayne suggested or even demanded that Heritage refrain from bidding, nor do Plaintiffs plead any specific factual allegations that would contradict the presumption that Heritage's decision not to bid was the result of anything other than Heritage's independent business decision.

Notably absent throughout the Complaints are specific facts about the alleged "coordination" and alleged "agreements" between Mayne and Heritage. Plaintiffs make no allegation of any counter promise or action on the part of Mayne that benefited Heritage or advanced the alleged conspiracy, nor any allegation of an exchange of price or bid information between Mayne and Heritage used to carry out their alleged "coordination." Accordingly, Plaintiffs fail to plead a conspiracy between Mayne and Heritage.

### D. The Complaints Contain No Factual Allegations To Support A Claim That Mayne Participated In Any So-Called "Overarching Conspiracy"

Because the Complaints fail to sufficiently plead a Doxy DR-specific conspiracy—the only drug-specific conspiracy in which Plaintiffs allege Mayne participated—the allegations that

12

Mayne participated in any "overarching conspiracy" must also fail, given Plaintiffs' allegations that the overarching conspiracy was effectuated through drug-specific conspiracies. *See* State CAC ¶ 242. But even if the Court concludes that Plaintiffs sufficiently alleged a single-drug Doxy DR conspiracy between Heritage and Mayne, Plaintiffs' allegations of an expansive "overarching conspiracy" fail for the reasons set forth below.

The specific factual allegations of communications between Mayne and Heritage concerning Doxy DR stand alone. There are <u>no factual allegations</u> that Mayne participated in the alleged "fair share" agreement that purports to underlie the so-called "overarching conspiracy" in the Plaintiffs' Complaints. There are <u>no factual allegations</u> that Mayne participated in any communication where there was discussion with a competitor about achieving a "fair share" of the market. Without such allegations, there is no legal basis to conclude that Mayne had knowledge of or was party to such an agreement—the fundamental requirements of a conspiracy claim. Moreover, Plaintiffs' own allegations that Mayne actively undermined the pricing structure of Mylan and Heritage in the Doxy DR market is directly inconsistent with the "fair share" conspiracy alleged. As examples:

The Complaints purport to allege that there was an industry-wide understanding that competitors would reach out to each other to resolve "fair share" issues. *See* State CAC ¶ 97. But Plaintiffs' own allegations that Mayne aggressively competed for Mylan's customers directly undermines the application of this "industry-wide understanding" to Mayne. *Id.* ¶ 212, 219-20. Indeed, there are no factual allegations that Mayne "reached out" to Mylan to resolve Doxy DR market shares. Instead, all of Plaintiffs' allegations indicate that Mayne continued to seek customers through price competition against Mylan, and that Mylan responded aggressively by offering still lower prices—the opposite of what Plaintiffs allege would have occurred had the

13

purported "fair share" agreement had applied to the Doxy DR market. *Id.*

The Complaints also purport to allege that there was a general understanding of the industry shares that would be obtained by a new market entrant under the "fair share" conspiracy. *See* State CAC ¶ 99. Under this arrangement, Mayne should have received close to a one-third proportional share of the Doxy DR market upon its entrance in February 2014. But under Plaintiffs' own allegations, this "fair share" allocation did not occur. Instead, *as alleged*, Mayne was foreclosed from a "fair share" entry into the Doxy DR market because of Mylan's and Heritage's competitive responses to Mayne's pricing. *Id.* ¶ 219-20.

The Complaints also purport to allege that bidding a lower price against competitors' established price was against the rules of the "fair share" conspiracy. *See* State CAC ¶ 106. Once again, Plaintiffs' own allegations of Mayne's conduct are completely inconsistent with this description of the operation of the conspiracy. First, they allege that Mayne attempted to secure a "large pharmacy customer" by reducing the price of Doxy DR. *Id.* ¶ 223. Next, Plaintiffs allege that Mayne's pricing competition for Doxy DR resulted in Heritage having to reduce its price by 30%. *Id.* ¶ 224. Thus, Plaintiffs' own allegations of Mayne's conduct demonstrate that Mayne did not conspire to maintain the price structure of the Doxy DR market, but instead directly undermined it through strong and aggressive price competition. Such conduct is wholly contrary to Plaintiffs' theory that Defendants acted in conformance with any "fair share" agreement.

The Complaints also purport to allege that the "fair share" agreement was implemented by a manufacturer by allowing a competitor to secure customers in a *different* generic drug market. *See* State CAC ¶ 101. Of course, this theory is wholly inapplicable to Mayne, who Plaintiffs allege only sold one drug.  There are no allegations and thus no basis to conclude that Mayne received any competitive concession in the Doxy DR market in exchange for a

concession to a non-competitor in another generic market in which Mayne did not participate.

The Complaints also allege that Heritage made a decision in April 2014 to raise the prices of eighteen (18) generic drugs. *See* State CAC ¶¶ 268-69. Plaintiffs do not allege that Doxy DR was one of the drugs subject to price increases. If Mayne was involved in an "overarching conspiracy" for all generic drugs, it is counterintuitive that Doxy DR would not have been included on this list—particularly when (1) Plaintiffs purport to allege other communications between Heritage and Mylan to raise prices on other drugs, and (2) the date of the alleged price increases is contemporaneous with Plaintiffs' alleged communications between Mayne and Heritage regarding the Doxy DR market.

In sum, there are no factual allegations to support Plaintiffs' claim that Mayne was aware of the central element of the purported "overarching conspiracy"—*i.e.*, that each new market entrant should receive its "fair share" of the market in exchange for maintaining the pricing structure in said market and across the generic drug industry at large. Instead, Plaintiffs' own factual allegations demonstrate that Mayne's conduct upon entering the Doxy DR market directly undermined any such "fair share" agreement. Accordingly, under its mandated authority to "insist upon . . . specificity in pleading," this Court must recognize that Plaintiffs' specific factual allegations are extraordinarily limited and deficient as to Mayne. The Court must also ignore Plaintiffs' numerous conclusory and general allegations of a nebulous "overarching agreement" for which there are no factual allegations specific to Mayne and against which the specific factual allegations of Mayne's conduct directly contradict Plaintiffs' theory.

## CONCLUSION

For the reasons set forth above, the Court should dismiss the Multi-Drug Complaints against Mayne.

                                            Respectfully Submitted,

Dated:  February 21, 2019                      */s/ Michael E. Martinez*

                                            Michael Martinez
                                            Steven Kowal
                                            Lauren Norris Donahue
                                            Brian J. Smith
                                            **K&L GATES LLP**
                                            70 W. Madison St., Suite 3300
                                            Chicago, IL 60602
                                            Tel. 312-372-1121
                                            Fax 312-827-8000
                                            michael.martinez@klgates.com
                                            steven.kowal@klgates.com
                                            lauren.donahue@klgates.com
                                            brian.j.smith@klgates.com

                                            *Counsel for Defendant Mayne Pharma Inc.*