**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

-----------------------------------------------------------------x

IN RE: GENERIC PHARMACEUTICALS      :
PRICING ANTITRUST LITIGATION      :   **MDL NO. 2724**
     :   **16-MD-2724**

_____ :   **Individual Case No: 18-cv-04137**

     :
THIS DOCUMENT RELATES TO:      :   **HON. CYNTHIA M. RUFE**
     :
*Marion Diagnostic Center, LLC et al. v.*      :
*McKesson Corporation et al.*      :
     :

-----------------------------------------------------------------x

**DEFENDANTS MCKESSON CORPORATION AND MCKESSON MEDICAL-
SURGICAL, INC.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO
DISMISS MARION DIAGNOSTIC CENTER, LLC AND MARION HEALTHCARE
LLC'S FIRST AMENDED CLASS ACTION COMPLAINT**

## **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ...................................................................................................................... 3

A.  The Role of Distributors in the Market for Pharmaceuticals ............................................ 3

B.  The Alleged Underlying Conspiracy ................................................................................. 3

C.  Relevant Allegations Regarding McKesson ...................................................................... 4

D.  Procedural Background..................................................................................................... 5

ARGUMENT ........................................................................................................................... 6

A.  Marion Fails to State a Claim Against McKesson.............................................................. 6

    1.  Legal Standard .......................................................................................................... 7

    2.  Marion Has Not Alleged "Conscious Commitment" By McKesson...................... 8

    3.  Marion Has Not Offered Any Circumstantial Evidence to Support
       McKesson's Involvement ..................................................................................... 11

       a.  No Parallel Conduct...................................................................................11

       b.  No "Plus Factors" .....................................................................................11

          (1)  McKesson's Pricing Structure Is Customary ................................. 12

          (2)  Agreeing to Purchase Product At Higher Prices In a
               Burgeoning Economy Is Not Indicative of a Conspiracy.............. 13

          (3)  Business Relationships With Suppliers Are Normal...................... 14

          (4)  There Is Nothing Unusual About McKesson's Hiring.................. 14

          (5)  Sponsoring Trade Association Activities Does Not Alone Show
               An "Opportunity To Collude"....................................................... 15

          (6)  McKesson Has Not Been Named As A Defendant By Any
               Government Entity ......................................................................... 16

    4.  No Allegations of McKesson's Role In The Conspiracy...................................... 17

B.  Marion Lacks Standing Under *Illinois Brick* ................................................................. 18

    1.  Legal Standard ........................................................................................................ 18

    2.  Marion Is an Indirect Purchaser and No Exception Applies................................. 19

C.  Marion Lacks Standing to Bring Claims Under State Antitrust Law ............................... 20

CONCLUSION....................................................................................................................... 20

## CASES

*Alfaro v. E.F. Hutton & Co*,
  606 F. Supp. 1100 (E.D. Pa. 1985) ...................................................................................... 7, 17

*Am. Mot. Inns v. Holiday Inns*,
  521 F.2d 1230 (3d Cir. 1975)..................................................................................................... 18

*Bateman Eichler Hill Richards, Inc. v. Berner*,
  472 U.S. 299 (1985)..................................................................................................... 2, 18, 20

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................................... passim

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993).......................................................................................................... 9

*Continental T.V., Inc. v. GTE Sylvania Inc.*,
  433 U.S. 36 (1977)............................................................................................................ 14

*Fenerjian v. Nongshim Co., Ltd.*,
  72 F. Supp. 3d 1058 (N.D. Cal. 2014) .................................................................................... 10

*Flanagan v. Shively*,
  783 F. Supp. 922 (M.D. Pa. 1992) .......................................................................................... 17

*Hall v. United Air Lines, Inc.*,
  296 F. Supp. 2d 652 (E.D. N.C. 2003).................................................................................... 15

*Howard Hess Dental Labs, Inc. v. Dentsply Int'l, Inc.*,
  424 F.3d 363 (3d Cir. 2005)............................................................................................ 17, 18

*Hunt v. Mobil Oil Corp.*,
  465 F. Supp. 195 (S.D.N.Y. 1978) ........................................................................................... 8

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977)..................................................................................................... 2, 18, 19

*In re Baby Food Antitrust Litig.*,
  166 F.3d 112 (3d Cir. 1999)..................................................................................................... 12

*In re Brand Name Prescription Drugs Antitrust Litig.*,
  1996 WL 167350 (N.D. Ill. 1996) ............................................................................................ 8

*In re Chocolate Confectionary Antitrust Litig.*,
  999 F. Supp. 2d 777 (M.D. Pa. 2014).................................................................................... 11

*In re Effexor Antitrust Litig.*,
  2018 WL 6003893 (D.N.J. Nov. 15, 2018) ............................................................................ 20

*In re Elec. Carbon Prods. Antitrust Litig.*,
   333 F. Supp. 2d 303 (D.N.J. 2004) ...................................................................... 7

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007)................................................................................... 17

*In re Flat Glass Antitrust Litig.*,
   385 F.3d 350 (3d Cir. 2004).................................................................................. 13

*In re Generic Pharms. Pricing Antitrust Litig.*,
   No. 16-md-2724 (E.D. Pa. Oct. 16, 2018), ECF Doc. No. 721 ...................................... passim

*In re Generic Pharms. Pricing Antitrust Litig.*,
   No. 16-md-2724 (E.D. Pa. Feb. 15, 2019), ECF Doc. No. 857 ............................................. 20

*In re Graphics Processing Antitrust Litig.*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) ................................................................. 16

*In re Ins. Brokerage Antitrust Litig*,
   618 F. 3d 300 (3d Cir. 2010)............................................................................ 8, 16

*In re Processed Egg Prods. Antitrust Litig.*,
   821 F. Supp. 2d 709 (E.D. Pa. 2011) ...................................................................... 7

*In re Vitamins Antitrust Litig.*,
   320 F. Supp. 2d 1 (D.D.C. 2004) .......................................................................... 8

*In re Wellbutrin XL Antitrust Litig.*,
   260 F.R.D. 143, 156-58 (E.D. Pa. 2009) ................................................................ 20

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007)....................................................................................... 17

*Marion Diagnostic Ctr. v. Becton, Dickinson & Co.*,
   No. 3:18-cv-01059 (S.D. Ill. 2018)................................................................... 2, 19

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555, 560 (1992).................................................................................. 20

*Marion Healthcare v. S. Ill. Healthcare*,
   No. 3:12-cv-871 (S.D. Ill. 2012)........................................................................... 2

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)........................................................................................ 8

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984)................................................................................. 7, 9, 14

*Rick-Mik Enters. Inc. v. Equilon Enters., LLC,*
    532 F.3d 963 (9th Cir. 2008). ................................................................. 6

*Royal Mile Co. v. UPMC,*
    No. 10-1609, 2013 WL 5436925 (W.D. Pa. Sept. 27, 2013)................................................. 20

*Superior Offshore Int'l, Inc. v. Bristow Group, Inc.,*
    490 F. App'x 492 (3d Cir. 2012) ........................................................... 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 ............................................................................ 15

*Toys 'R' Us, Inc. v. F.T.C.,*
    221 F.3d 928 (7th Cir. 2000) .............................................................. 17

*Valspar Corp. v. E.I. Du Pont De Nemours & Co.,*
    873 F.3d 185 (3d Cir. 2017).................................................................. 9

*W. Penn Allegheny Health Sys., Inc. v. UPMC,*
    627 F.3d 85 (3d Cir. 2010)................................................................... 7

*Warren Gen. Hosp. v. Amgen, Inc.,*
    643 F.3d 77 (3d Cir. 2011)................................................................. 19

## STATUTES

Clayton Act ............................................................................ 2, 17, 19

Sherman Act............................................................................ passim

## OTHER REFERENCES

4 Areeda & Hovenkamp, ANTITRUST LAW, ¶ 1474c (4th ed. 2017) ........................................... 12

*Antitrust Resource Manual*, UNITED STATES DEP'T OF JUSTICE (Nov. 2017)................................ 9

McKesson FY 2018 Form 10-K ............................................................... 15

Richard A. Posner and William M. Landes, *Should Indirect Purchasers Have
Standing to Sue Under the Antitrust Laws? Economic Analysis of Illinois
Brick,* 46 U. CHI. L. REV. 602, 609 (1979)............................................. 10

## I.    PRELIMINARY STATEMENT

McKesson Corporation and McKesson Medical Surgical, Inc. (collectively "McKesson"[1]) are distributors of generic pharmaceutical products, and purchase such products directly from manufacturers.  Plaintiffs Marion Diagnostic Center, LLC and Marion Healthcare LLC (collectively "Marion" or "Plaintiffs") claim that McKesson participated in a manufacturer-level conspiracy to fix the prices at which generic drugs are sold to customers, including to McKesson itself.  Marion's allegations against McKesson are so vague that they could just as easily apply to any direct purchaser.  Accordingly, if Marion's complaint were allowed to go forward, it would essentially transform the class of Direct Purchaser Plaintiffs into defendants.

There is no basis for Marion's claims to proceed.  At this stage, Marion is required to allege facts showing that McKesson *consciously committed* to the manufacturers' conspiracy.  It has not done so.  Rather, it alleges that McKesson, as a purchaser facing higher prices, "must have known" of the manufacturers' conspiracy and is therefore a part of the conspiracy.  But that proposition targets the wrong standard.  No court has ever imposed liability on the customer of a conspiracy because it should have known about the conspiracy.  Moreover, Marion's claim that McKesson "must have known" contradicts the position that plaintiffs in this MDL have repeatedly and explicitly taken to avoid statute of limitations bars:  A buyer cannot infer a conspiracy from the mere fact of higher prices.

Notwithstanding these shortcomings, Marion named McKesson, not because it can plead facts that support McKesson's involvement, but rather because Marion, a serial

---

[1]      McKesson does not admit that McKesson Corporation and McKesson Medical Surgical, Inc. constitute a single legal entity or are a single legal entity with any other related company.

antitrust plaintiff,[2] needed to join a distributor defendant in order to invent a new and "different" putative class for its counsel to lead.  As an indirect purchaser of the drugs at issue (it alleges it buys from McKesson), Marion is barred under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), from recovering from the manufacturer defendants under the Clayton Act, which authorizes private suits for violations of the Sherman Act.  By asserting a claim against McKesson, Marion purports to transform itself into a "direct purchaser from a distributor" and recover under the Clayton Act.  But Marion fundamentally misses the mark on the indirect purchaser rule.  For the "co-conspirator" exception to *Illinois Brick* to apply, the Third Circuit requires a plaintiff to plead (and ultimately prove) the middleman's involvement in the upstream conspiracy was "truly complete," namely that it "aggressively supported and furthered" the scheme to such an extent that the middleman itself would be barred from bringing suit.  *Bateman Eichler Hill Richards, Inc. v. Berner*, 472 U.S. 299, 308 (1985).  Marion's complaint fails even to allege "conscious commitment" by McKesson, so it *a fortiori* fails to allege McKesson's "complete involvement."

Finally, Marion lacks standing to bring state antitrust claims on behalf of its putative class.  Marion is an Illinois company and does not allege that it operates in or was injured in any other state.  As this Court already held, the Illinois Antitrust Act prohibits class recovery by private plaintiffs. Without the ability to pursue class recovery under the laws of its own state, and without standing to redress its injuries under the laws of any other state, Marion's state antitrust claims must be dismissed.

---

[2]     *See also Marion Diagnostic Ctr. v. Becton, Dickinson & Co.*, No. 3:18-cv-01059 (S.D. Ill. 2018); *Marion Healthcare v. S. Ill. Healthcare*, No. 3:12-cv-871 (S.D. Ill. 2012).

## II.    BACKGROUND

### A.    The Role of Distributors in the Market for Pharmaceuticals

Distributors like McKesson fill an important role in the supply chain. SAG Compl. ¶¶ 67-68.[3] Specifically, they add value to the supply chain by centralizing the availability and distribution of thousands of drugs, thereby allowing their customers (primarily pharmacies, including pharmacies housed within medical facilities like Marion) to engage in one-stop shopping and avoid the enormous expense of contracting separately with hundreds of manufacturers. *Id.* To fulfill this role, McKesson and other distributors typically purchase branded and generic drugs from manufacturers and stock those drugs in inventory, awaiting purchase orders from their customers. McKesson's direct competitors are other distributors such as Amerisource Bergen, Cardinal Health, H.D. Smith, Morris & Dickerson, and Owens & Minor. SAG Compl. ¶ 68.

### B.    The Alleged Underlying Conspiracy

Marion does not allege that there was any agreement among McKesson and any of these other distributors or that competition between the distributors was harmed, lessened or otherwise subject to any improper or illegal agreement. Instead, like the other plaintiffs, Marion alleges that the manufacturer defendants engaged in a horizontal conspiracy to "unlawfully allocate[] customers (including McKesson) among themselves as far back as 2012." Marion Compl. ¶ 75. Marion alleges that 16 manufacturers and 30 drug formulations were involved in the conspiracy, but it claims that each is part of a "larger overarching conspiracy," *id.* ¶ 51, that goes beyond "the Defendant manufacturers named" in the complaint, *id.* ¶ 50, and includes "all,

---

[3]    References to Marion's First Amended Complaint are styled as the "Marion Compl." and references to the State Attorney General complaint, which is incorporated by reference into the Marion complaint, are styled as the "SAG Compl."

or nearly all generic drugs." *Id.* ¶ 51.  The complaint alleges that the manufacturers "allocate the market for an individual drug based on the number of competitors and the timing of their entry so that each competitor obtains an acceptable share of the market." *Id.* ¶ 56.

The complaint alleges the horizontal scheme among the manufacturers was effective and significantly increased the prices paid by distributors like McKesson. *See id.* ¶ 78. In turn, distributors are alleged to have increased the resale prices they charged to their own customers, *see id.* ¶ 104, such as Marion, an Illinois healthcare provider that "purchased generic drugs . . . directly from McKesson Medical-Surgical, Inc. over the last four years." *Id.* ¶¶ 12-13.

### C.    Relevant Allegations Regarding McKesson

Unlike the SAG Complaint or any other complaint, Marion alleges that the list of co-conspirators includes some of the very customers, including McKesson, that were allegedly allocated amongst the manufacturers. *Id.* ¶ 7; *see also id* ¶ 75 (conspiracy to "unlawfully allocate[] customers (including McKesson) among themselves as far back as 2012.").  Marion alleges specific instances where McKesson was deprived of competitive bids because of the manufacturers alleged conspiracy. *Id.* ¶¶ 85-86.  Irreconcilably, Marion then states in conclusory fashion that McKesson "cooperated with, and concealed, the conspiracy," *id.* ¶ 112, although Marion does not (because it cannot) specify any action that McKesson supposedly took to "cooperate" with or to "conceal" the conspiracy that it alleges victimized McKesson.

Instead, Marion *first* alleges that McKesson must have known the manufacturers were colluding because "[n]umerous, sophisticated McKesson purchasing personnel can hardly have failed to notice that" bidding for McKesson's business "has been much less than robust and fully-competitive" or that there were "radical . . . price spikes paid by McKesson in 2013 and 2014." *Id.* ¶¶ 77-78.  *Second*, Marion alleges that McKesson had "close relationships" with the manufacturers that sold to it, including Heritage, which had two executives plead guilty to price

4

fixing, *id.* ¶ 84, although Marion does not allege anything unique about McKesson's relationship with Heritage except that Heritage harmed McKesson by agreeing with other manufacturers not to make competitive bids to McKesson. *Id.* ¶¶ 85-86. **Third**, Marion alleges that four former employees of Mylan Pharmaceuticals now work at McKesson (two at McKesson Canada), *id.* ¶ 92-95, and that five former McKesson employees now work for manufacturer defendants in various capacities. **Fourth**, Marion alleges that McKesson's distribution business continued to earn profits during the course of the manufacturers' alleged conspiracy. Specifically, it alleges that distributors like McKesson "actually benefit when [generic] prices are higher," *id.* ¶ 109 because its pricing structure consists of "routine percentage mark ups" on top of the purchase price it pays to the manufacturers. *Id.* ¶ 73. **Fifth**, Marion alleges that distributors like McKesson and the trade associations that represent them sponsored some of the industry trade events at which the manufacturer defendants allegedly conspired. *See id.* ¶ 116-121. **Finally**, its complaint alleges that an NPR reporter interpreted the SAG Complaint to "suggest – but [n]ot allege – that the price fixing conspiracy has also involved drug distributors," *id.* ¶ 118, and that *The Connecticut Mirror* reported in January 2017 that "the investigation is growing beyond the companies named in the suit, *id.* ¶ 117. Neither article identifies McKesson as having any role whatsoever in the alleged manufacturer conspiracy. Notably, neither the SAG Complaint nor the Marion Complaint alleges that McKesson or any other distributor participated in the text messages, phone calls, or in-person meetings through which the manufacturer defendants allegedly concluded the agreements among themselves.

### D. Procedural Background

In June 2018, nearly two years after the Court first began receiving applications from counsel to serve on the Plaintiffs' Steering Committees ("PSCs"), Marion, which sits at the same distribution level as the IRPs, sought leave to file a complaint in a separate class track.

ECF Doc. No. 638.  The Court denied Marion's motion as procedurally improper.  ECF Doc. No.

703.  Marion then filed its complaint, which it has since amended, and it is once again seeking a

separate class track for itself.  ECF Doc. No. 729.  Marion purports to bring claims on behalf of

"[a]ll persons or entities that have directly purchased generic drugs from . . . McKesson in the

United States," Marion Compl. ¶ 124, under both the Clayton Act (on behalf of purchasers in all

50 states) and under state law (in the 26 states that allow indirect purchaser actions), *id.* ¶¶ 132-

70.

## III.   ARGUMENT

### A.   Marion Fails to State a Claim Against McKesson[4]

Marion's complaint fails plausibly to allege that McKesson, the manufacturers'

customer, "consciously committed" to any "common scheme" among the manufacturers to fix or

stabilize prices.  A party cannot be held accountable for an antitrust conspiracy merely because

that party "must have known" of the conspiracy, but that is what Marion asks the Court to do.

Second, the purported "evidence" alleged by Marion is plainly deficient to

plausibly plead McKesson's involvement in the manufacturers' conspiracy.  Marion readily

admits that it lacks direct evidence of participation by McKesson in any conspiracy.  *See* Marion

Compl. ¶ 113 ("Marion contends that it is likely that, after complete discovery . . . there will be

direct evidence of McKesson's cooperation and concealment.").  Instead, it purports to rely on

"circumstantial evidence," namely "parallel conduct and plus factors," *id.,* but its complaint

pleads neither.

Third, Marion fails to offer even a rudimentary explanation of McKesson's

---

[4]      Marion's failure to state a claim under federal law also warrants dismissal of its state antitrust claims,
which "are derivative of the federal law claims." *Rick-Mik Enters. Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 976
n. 5 (9th Cir. 2008).  "Because the federal claims fail, the state law claims fail." *Id.*

supposed role in the conspiracy, which dooms Marion's claims.

        1.    <u>Legal Standard</u>

        In order adequately to plead a claim under Section 1 of the Sherman Act or any state antitrust laws, a complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Plaintiff must allege facts showing that each conspirator made a "***conscious commitment*** to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).[5] "The crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an ***agreement***, tacit or express." *Twombly*, 550 U.S. at 553.

        The complaint must be dismissed as to a particular defendant if the complaint fails to allege that specific defendant "actually joined and participated in the conspiracy," *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709 (E.D. Pa. 2011), and "played some role in it," *In re Elec. Carbon Prods. Antitrust Litig.*, 333 F. Supp. 2d 303, 311 (D.N.J. 2004); *see also Alfaro v. E.F. Hutton & Co., Inc.*, 606 F. Supp. 1100, 1117-18 (E.D. Pa. 1985) (explaining that a complaint must "describe the general composition of the conspiracy, some or all of its broad objectives, and *defendant's general role in that conspiracy*"). Thus, a plaintiff may not proceed without "specific allegations that would tie each particular defendant to the conspiracy," *Processed Egg Prods.*, 821 F. Supp. 2d at 720.

        The factual allegations offered to meet the plaintiff's pleading burden may take the form of either (1) direct evidence or (2) circumstantial evidence supporting an inference of conspiracy, such as parallel conduct and certain recognized "plus factors." *W. Penn Allegheny*

---

[5]      Unless otherwise indicated, all emphasis has been added and internal citations and quotations omitted.

*Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010); *In re Generic Pharms. Pricing*

*Antitrust Litig.*, No. 16-md-2724 (E.D. Pa. Oct. 16, 2018), ECF Doc. No. 721, at 44-45.

Regardless of how it seeks to prove its case, the Supreme Court requires that the complaint

"must tend to rule out the possibility that defendants were acting independently." *Twombly*, 550

U.S. at 554; *see also In re Ins. Brokerage Antitrust Litig*, 618 F. 3d 300, 321 (3d Cir. 2010).

Thus, allegations as to a specific defendant that are equally consistent with independent conduct

cannot support a claim against that defendant. *See Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp*., 475 U.S. 574, 597 n. 21 (1986).

>    2.    Marion Has Not Alleged "Conscious Commitment" By McKesson

No court has ever imposed liability on a customer of a price-fixing conspiracy

simply because the customer purportedly should have known about the conspiracy and, in some

plaintiff's opinion, did not do enough to counteract it. Yet that is exactly what Marion asks the

Court to do here. Marion alleges that McKesson's buying personnel "can hardly have failed to

notice" the spikes in the prices for some drugs out of the thousands of drugs that McKesson

purchases from manufacturers. Marion Compl. ¶ 78. It alleges that it is "highly plausible" that

purchasers at McKesson "sought to learn why" competition seemed to be less robust than usual.

*Id.* ¶ 79. It alleges that McKesson's relationship with its supplier, Heritage, gave it "a ready,

close source of intelligence to confirm any suspicion of anticompetitive activity." *Id.* ¶ 81. As a

result, Marion alleges that "it is highly plausible [McKesson] has been aware of an overarching

conspiracy." *Id.* ¶ 83. *Id.* ¶ 123.

But Section 1 of the Sherman Act requires agreement, *Twombly*, 550 U.S. at 556,

not mere suspicion or even knowledge. *See In re Brand Name Prescription Drugs Antitrust*

*Litig.*, 1996 WL 167350, at *23 (N.D. Ill. 1996) ("[I]t is improper to equate knowledge of

another's practice with knowing participation in an illegal conspiracy."), *rev'd on other grounds*,

8

123 F. 3d 599 (7th Cir. 1997); *In re Vitamins Antitrust Litig*., 320 F. Supp. 2d 1, 16 (D.D.C. 2004) ("Knowledge alone is not sufficient to prove that any particular Defendant intended to join" the price-fixing conspiracy); *Hunt v. Mobil Oil Corp.*, 465 F. Supp. 195, 231 (S.D.N.Y. 1978)); *Antitrust Resource Manual*, UNITED STATES DEP'T OF JUSTICE (Nov. 2017) ("Of course, mere knowledge of the conspiracy without participation in the conspiracy does not make a defendant a member of the conspiracy."). Independent action (*i.e.*, conduct undertaken absent agreement) is simply outside the scope of Section 1. *Twombly*, 550 U.S. at 554 (citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)). That is why, even at the pleading stage, the plaintiff must allege facts tending to exclude the possibility of independent action. *See Monsanto*, 465 U.S. at 764. In this case, Marion has not alleged that McKesson agreed to anything with anybody.

Moreover, Marion fails even to allege facts supporting the "must have known" standard that it made up for itself. The theory that McKesson "must have known" largely rests on repeated allegations that McKesson "can hardly have failed to notice" rising prices and reduced bidding, that these phenomena were purportedly not readily explained absent anticompetitive conduct, and that McKesson had unspecified sources of intelligence at the industry trade shows. Marion Compl. ¶¶ 77-82. Yet prices can and do increase for a host of reasons, including inflation, increased demand, or higher input costs. Prices can also increase as the result of "conscious parallelism," *i.e.*, the lawful phenomenon by which firms in a "concentrated market . . . set[] their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests." *Brooke Group*, 509 U.S. at 227. As the Third Circuit explained in *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, allegations of parallel price increases "largely restate the phenomenon of interdependence." 873 F.3d 185, 196 (3d Cir.

2017).  In that case, the plaintiffs had identified significant price increases and, like Marion, asserted that they were "not correlated to any supply-and-demand principles."  *Id.* at 197.  The Third Circuit explained that "[w]hile true," those facts were "largely irrelevant because [they] ignore the fact that firms in a concentrated market may" raise prices to "supracompetitive levels . . . without engaging in any overt concerted action."  If a court cannot infer conspiracy from price increases, neither can a purchaser.  That is why, as other plaintiffs have argued in this litigation, "knowledge of price increases alone . . . does not inform a [purchaser] of antitrust violations."  No. 16-dg-27243, ECF Doc. No. 50, at 28-29 (quoting *Fenerjian v. Nongshim Co., Ltd.*, 72 F. Supp. 3d 1058, 1077-78 (N.D. Cal. 2014)) (opposing manufacturers' statute of limitations defense).[6]

    To the extent that McKesson and other direct purchasers have more visibility into real-time pricing and real-time "competition" between their suppliers than other market participants do, longstanding antitrust doctrine recognizes that this fact is precisely what makes the direct purchaser the superior antitrust *plaintiff*, not a part of the conspiracy.  *See* Richard A. Posner and William M. Landes, *Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws? Economic Analysis of Illinois Brick,* 46 U. CHI. L. REV. 602, 609 (1979) ("The direct purchaser deals directly with the violator, and probably with [the violator's] competitors, and [the direct purchaser] is therefore in a better position than a more remote purchaser to detect a conspiracy or other antitrust violation.").

---

[6]  In arguing that the state law claims of the IRPs and EPPs are time-barred, the manufacturer defendants asserted that the claims accrued in 2013, when the price increases were implemented.  In response, the IRPs and EPPs argued that "changes in prices cannot trigger inquiry notice . . . ."  No. 16-dg-27243, ECF Doc. No. 50, at 28.

### 3. Marion Has Not Offered Any Circumstantial Evidence to Support McKesson's Involvement

Marion admittedly has no direct evidence of McKesson's involvement in the manufacturers' alleged conspiracy, *see* Marion Compl. ¶ 94, and instead seeks to support its pleading burden with circumstantial evidence, namely "parallel conduct and plus factors." But Marion alleges neither parallel conduct by McKesson nor any "plus factors."

#### a. No Parallel Conduct

Marion has not offered even a cursory explanation of how McKesson's actions were supposedly "parallel" to those of the conspiring manufacturers. In its October 2018 opinion resolving the Group 1 motions to dismiss, the Court focused on the degree of similarity between the competing manufacturers' pricing practices and explained that reasonably similar actions may constitute "parallel conduct" even if the price increases were not identical in time or magnitude. *In re Generic Pharms. Pricing Antitrust Litig.*, ECF Doc. No. 721 at 45-55. But Marion does not allege that McKesson's conduct was "reasonably proximate in time and value" to that of the manufacturers. *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 787 (M.D. Pa. 2014), *aff'd*, 801 F.3d 383, 392 (3d Cir. 2015). Indeed, it is different in kind. McKesson, a distributor, is situated at a different level of the supply chain from the manufacturers and fulfills a wholly different function from the manufacturers—thus, in no sense can McKesson's conduct be described as "parallel" to that of the manufacturers'.

#### b. No "Plus Factors"

Even if Marion had alleged parallel conduct between McKesson and the manufacturers, Marion has alleged no "plus-factors" connecting McKesson to the alleged manufacturer conspiracy. "Plus factors," when properly alleged, provide context that suggests the parallel conduct was indeed the result of a preceding agreement "and not the result of

11

independent business decisions of the competitors." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 122 (3d Cir. 1999). None of Marion's supposed "plus factors" accomplish that.

Marion makes six allegations purportedly showing that McKesson conspired with manufacturers: (1) McKesson's pricing structure allowed it to earn profits despite increasing drug prices; (2) McKesson continued to purchase drugs after the defendant manufacturers raised their prices; (3) McKesson has a "close" relationship with some of the manufacturers from which it purchases; (4) a few current McKesson employees have previously worked for manufacturers; (5) McKesson sponsors industry events and participates in trade association activities; and (6) certain State Attorneys General are "looking at" whether unspecified distributors were involved in the conspiracy. None of these alleged facts suggests McKesson engaged in a conspiracy; each is at least as consistent with independent conduct on the part of McKesson and is consistent is the independent behavior of any distributor in any supply chain.

### *(1)    McKesson's Pricing Structure Is Customary*

First, Marion alleges that McKesson's cost-of-goods pricing structure allowed it to continue earning profits despite increasing drug prices. *See* Marion Compl. ¶ 123. But there is nothing remotely suspect about a distributor implementing a cost-of-goods pricing model. There are legitimate reasons for doing so, such as insulating the distributor from the risk of rising manufacturer prices, and in fact the model is extremely common across a range of industries. *See* 4 Areeda & Hovenkamp, ANTITRUST LAW, ¶ 1474c (4th ed. 2017) ("[T]he distributor taking its usual markup does not share a 'conscious commitment' . . . as the Supreme Court has required"). Nothing about this commonplace pricing method is suggestive of concerted, rather than independent, conduct, and that is ultimately the point of the "plus-factor" analysis. Further, profitability itself is not a plus-factor suggestive of conspiracy. *In re Baby Food Antitrust Litig.*, 166 F.3d at 134-35 ("In a free capitalistic society, profit is always a motivating factor in the

12

conduct of business.  Profit is a legitimate motive in pricing decisions, and something more is required before a court can conclude that competitors conspired to fix prices.").

> ### (2) Agreeing to Purchase Product At Higher Prices In a Burgeoning Economy Is Not Indicative of a Conspiracy

Second, Marion alleges that McKesson "has acted contrary to its independent, rational economic self-interest (in favor of the purchase of product on competitive terms and conditions) by continually accepting large, unlawful price increases. . . ."  Marion Compl. ¶ 123. But this is just another way of saying that that the *manufacturers* acted against McKesson's interest.  The amended complaint does not specify any action that McKesson took against its own self-interest, and indeed, the immediately preceding sentence of Marion's complaint says that McKesson made "billions of dollars of additional margins on its resale of generic drugs due to its routine percentage mark-up" of the manufacturers' above-competitive pricing.  *Id.*  If true, that directly contradicts Marion's assertion that higher purchase and resale prices are against McKesson's interest.

Typically, the "acts against self-interest" inquiry focuses on the irrationality of a seller unilaterally exchanging confidential information, *see In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 n. 12 (3d Cir. 2004) or raising prices unilaterally in a commoditized market without assurances that its competitors will do the same, *In re Generic Pharms. Pricing Antitrust Litig.*, ECF Doc. No. 721 at 57.  Such actions among horizontal competitors are irrational because, without similar conduct by their alleged co-conspirators, the firm in question is likely to be undercut and lose sales.  By contrast, Marion's complaint does not explain how it was irrational for McKesson to continue purchasing from the manufacturers, or even that it had another choice.  Indeed, it would have been irrational for McKesson to stop purchasing drugs from the manufacturers; even at a higher price, McKesson still must stock a drug or else its

13

customers would simply divert their purchases to competing distributors that do.

### (3)     Business Relationships With Suppliers Are Normal

Third, Marion alleges that McKesson has a "close" relationship with Heritage, which told other manufacturers not to bid for McKesson's business.  *E.g.,* Marion Compl. ¶ 84-87.  But McKesson is a distributor and Heritage is a manufacturer and there is nothing suspicious about a relationship between the two.  *See Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54-55 (1977) (describing the "substantial scholarly and judicial authority" recognizing that vertical relationships are generally pro-competitive rather than anti-competitive.).  McKesson has relationships with many manufacturers (upstream) and many retailers and healthcare providers (downstream), and indeed those vertical relationships comprise the very source of an intermediate distributor's value in the supply chain.  Nothing about those ordinary business relationships suggests McKesson consciously committed to any conspiracy.  *See Monsanto*, 465 U.S. at 762 ("[T]he fact that a manufacturer and its distributors are in constant communication about prices and marketing strategy does not alone show that the distributors are [conspiring with the manufacturers].  A manufacturer and its distributors have legitimate reasons to exchange information about the prices and the reception of their products in the market.").

### (4)     There Is Nothing Unusual About McKesson's Hiring

Fourth, Marion devotes a full 18 paragraphs of its amended complaint to innuendo regarding a supposed pattern of "movement of knowledgeable officers among McKesson and central conspirators" that purportedly "facilitated" McKesson's alleged collusion and provided McKesson with a "ready source of information" about the conspiracy.  But these conclusory allegations are unsupported by facts.  Of the approximately 78,000 people employed at McKesson, the complaint identifies just four individuals who previously worked for a manufacturer and now work for McKesson and five individuals who previously worked at

14

McKesson and now work for a manufacturer. *See* McKesson FY 2018 Form 10-K, at 10.[7]  That

Marion has identified so few McKesson employees with prior manufacturer experience—two of

whom work in a separate Canadian entity, two of whom started at McKesson in the past two

years (well after this litigation commenced), and none of whom are part of McKesson's senior

management—highlights how irrelevant these allegations are.  Marion does not propose that the

named employees participated in any collusive activities themselves, or that they shared

information with their former employers after the fact, or that they even had job responsibilities

related to purchasing drugs or interfacing with manufacturers.  Nothing in Marion's allegations

about personnel makes McKesson's participation in the manufacturers' alleged conspiracy any

more likely.  *See Superior Offshore Int'l, Inc. v. Bristow Group, Inc.*, 490 F. App'x 492, 494 (3d

Cir. 2012) (allegations that "employees often moved between companies" insufficient to sustain

a Section 1 claim); *Hall v. United Air Lines, Inc.*, 296 F. Supp. 2d 652, 662 (E.D. N.C. 2003)

(similar allegations are "tenuous at best, and completely unconvincing at worst.").

> *(5)    Sponsoring Trade Association Activities Does Not Alone
>         Show An "Opportunity To Collude"*

Fifth, Marion suggests that McKesson had opportunity to collude with the

manufacturers because McKesson sponsored and attended trade association events.  These

allegations are irrelevant.  Unlike the complaints against the manufacturers, which "set forth

detailed allegations regarding Group 1 Defendants' representation on trade association boards

along with allegations regarding their trade association memberships and meeting attendance," *In

re Generic Pharms. Pricing Antitrust Litig.*, ECF Doc. No. 721 at 59, Marion's complaint does

not actually put McKesson in the room where the encounters allegedly happened, and instead

---

[7]      Marion cites McKesson's FY 2018 Form 10-K  in its complaint, Marion Compl. ¶ 109, so the Court may
properly consider it at this stage. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

alleges generally that McKesson sponsored various industry events and participated in trade association activities. *See* Marion Compl. ¶¶ 120-22; *cf. In re Graphics Processing Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) ("Moreover, even where some competitors have admitted to meeting to fix prices at or near trade shows or conferences, it is not reasonable to infer that another competitor in attendance at the same meeting had done likewise."). Even more importantly, there is nothing inherently questionable about participating in industry events between buyers and sellers. *See In re Ins. Brokerage Antitrust Litig*, 618 F. 3d at 349. The reason the "opportunity to collude" plus-factor is often cited for showing a horizontal conspiracy is that rivals often lack legitimate pro-competitive justifications for meeting with each other. The same is not true for meetings between buyers and sellers. *See Monsanto*, *supra*. This is perfectly legitimate non-collusive behavior.

### (6)   *McKesson Has Not Been Named As A Defendant By Any Government Entity*

Finally, Marion alleges that McKesson may be a target of the ongoing investigations by the DOJ and the State Attorneys General. Although the Court has noted that, "in the right circumstances, 'government investigations may be used to bolster the plausibility of § 1 claims,'" *In re Generic Pharms. Pricing Antitrust Litig.*, ECF Doc. No. 721 at 62, those circumstances are not present here because there is no indication that McKesson or any other distributor is actually a target of either investigation. Marion's allegation is based on two news articles, neither of which actually states McKesson is under investigation. These unfounded allusions are pure speculation and are meaningless.

\*       \*       \*       \*       \*

All told, each of Marion's allegations about McKesson's position and purported activities is wholly consistent with independent action. None suggests that McKesson agreed to

16

participate in any manufacturer conspiracy to fix and allocate drug prices.

### 4.   No Allegations of McKesson's Role In The Conspiracy

Marion's complaint against McKesson also fails because it lacks even a

rudimentary explanation of McKesson's supposed role in the conspiracy.  While Marion is

required to describe, among other things, McKesson's general role in the conspiracy, *Alfaro*, 606

F. Supp. at 1117-18, Marion has alleged only that McKesson acted as a normal distributor.

Marion has not alleged, for example, that McKesson supported the price-fixing conspiracy by

refraining from competition with other distributors, *see Leegin Creative Leather Prods., Inc. v.

PSKS, Inc.*, 551 U.S. 877 (2007), that McKesson entered into exclusive distribution agreements

with manufacturers that foreclosed other dealers, *see Howard Hess Dental Labs. Inc. v. Dentsply

Int'l, Inc.*, 424 F.3d 363 (3d Cir. 2005), or that McKesson acted as an information

clearinghouse in a manufacturer conspiracy, "shuttling commitments back and forth

between . . . manufacturers and helping to hammer out points of shared understanding," *see Toys

'R' Us, Inc. v. F.T.C.*, 221 F.3d 928 (7th Cir. 2000).  Instead, it alleges in a vague and conclusory

manner that McKesson engaged in some undefined form of "cooperation" and "concealment."

Marion Compl. ¶ 72, 123.  These allegations are meaningless; "cooperation with the conspiracy"

and "concealment of the conspiracy" are at least as conclusory as the allegations that the

*Twombly* defendants "agreed not to compete with one another," 550 U.S. at 551, or the "[b]are

conclusory allegations of 'conspiracy' or 'concerted action'" that courts regularly find

insufficient to allege a conspiracy.  *See Flanagan v. Shively*, 783 F. Supp. 922, 928 (M.D. Pa.

1992).  An antitrust plaintiff does not state a claim based on "entirely general terms without any

specification of any particular activities" by the defendants,. *In re Elevator Antitrust Litig.*, 502

F.3d 47, 50-51 (2d Cir. 2007).   But that is all Marion has offered with respect to McKesson.

Because Marion has not alleged that McKesson did anything other than act as any distributor did,

Marion has failed to connect McKesson to the alleged conspiracy among manufacturers.

**B.     Marion Lacks Standing Under *Illinois Brick***

Marion's federal claims are also barred because Marion is an indirect purchaser of the manufacturer defendants and accordingly is barred by *Illinois Brick* from recovering damages under the Clayton Act.

1.     Legal Standard

In *Illinois Brick*, "the Supreme Court established the general rule that only direct purchasers from antitrust violators may recover damages" under the Clayton Act, which authorizes private suits for violations of the Sherman Act. *Dentsply.*, 424 F.3d 363.  Where a conspiracy involves horizontal price-fixing among competing manufacturers, the distributor that purchased the price-fixed products from the manufacturers is typically exclusively empowered to bring suit. *See generally Illinois Brick*, 431 U.S. 720.  Where the plaintiff alleges that the distributor has conspired with the upstream manufacturers, however, the Third Circuit has left the door open to a theoretical "co-conspirator exception" to *Illinois Brick* under which the indirect purchaser may recover under the Clayton Act because the direct purchaser is barred from doing so.  This exception is very limited; to invoke it, an indirect purchaser must allege facts showing that "the middlemen [*i.e.*, McKesson] would be barred from bringing a claim against their former co-conspirator—the manufacturer—because their involvement in the conspiracy was 'truly complete' (*i.e.*, if the middlemen would be barred from suing by the 'complete involvement defense' of a manufacturer)." *Dentsply*, 424 F.3d at 378-79.  To be "completely involved," a co-conspirator must have "aggressively support[ed] and further[ed] the monopolistic scheme as a necessary part and parcel of it[.]" *Bateman Eichler Hill Richards,* 472 U.S. at 308; *see also Am. Mot. Inns v. Holiday Inns*, 521 F.2d 1230, 1254-55 (3d Cir. 1975) (allowing co-conspirator to sue where it had not "actively supported the entire restrictive

18

program, participated in its formulation and encouraged its continuation.").

2.       Marion Is an Indirect Purchaser and No Exception Applies

Marion has not come close to pleading facts that would satisfy this standard. Marion alleges that McKesson purchased the drugs in question directly from the manufacturer defendants and then later resold them to Marion. *See, e.g.*, Marion Compl. ¶¶ 12-13, 36, 114, 129, 131, 135. Accordingly, McKesson has the exclusive right under federal law to recover damages from the manufacturers for the overcharges on those drugs. *Warren Gen. Hosp. v. Amgen, Inc.,* 643 F.3d 77, 88 (3d Cir. 2011) (holding that a hospital which negotiated prices and rebates directly with manufacturer but which remitted payment directly to the distributor and physically took delivery from the distributor was an indirect purchaser barred by *Illinois Brick*).

To circumvent *Illinois Brick*, Marion joined McKesson as a defendant and argues it is therefore not an "indirect purchaser" but rather "the first non-conspiring party to purchase directly."[8]  Mot. for Third Electronic Case Management Protocol, ECF Doc. No. 729, at 9.  It describes its proposed class as those who "have purchased directly from the conspiracy through Defendant McKesson."  Marion Compl. ¶ 131.  But this is nothing more than creative misdirection; indirect purchasers have argued for years that they qualify as direct purchasers for purposes of the Clayton Act because the intermediate purchasers are co-conspirators as well.  In establishing the so-called "co-conspirator exception" to *Illinois Brick*, the courts sought to delineate the circumstances in which an indirect purchaser may indeed bring suit.  As explained in Part IV.A, Marion has not alleged *any* cognizable culpability by McKesson for the alleged price-fixing of the manufacturers.  *A fortiori*, it has not shown that McKesson "aggressively

---

[8]       Marion has a history of offering creative arguments as to why *Illinois Brick* should not apply to it.  In *Marion Diagnostic Center, LLC v. Becton, Dickinson, & Co.*, the Southern District of Illinois rejected a similar argument by Marion and dismissed Marion's complaint with prejudice.  No. 3:18-cv-01059, ECF Doc. No.  117.

support[ed] and further[ed] the monopolistic scheme as a necessary part and parcel of it,"
*Bateman Eichler Hill Richards*, 472 U.S. at 308, or was "at least substantially equal[ly]
responsib[le] for the violation."  *Royal Mile Co. v. UPMC*, 2013 WL 5436925, at \*39 (W.D. Pa.
Sept. 27, 2013).

### C.      Marion Lacks Standing to Bring Claims Under State Antitrust Law

Marion seeks in the alternative to recover under state antitrust law on behalf of a
putative "Indirect Purchaser Healthcare Class."  Marion Compl. ¶ 139.  On February 15, 2019,
the Court granted in part and denied in part the manufacturer defendants' Group 1 motions to
dismiss the IRPs' and EPPs' state-law claims.  McKesson respectfully requests that the Feb. 15
Order be given full and equal effect to any of Marion's surviving state law claims.

As this Court and others have held, the Illinois Antitrust Act's class action bar
presents a substantive conflict with Rule 23 and therefore controls.  *In re Generic Pharms.
Pricing Antitrust Litig.*, ECF Doc. No. 857 at 12.   Indirect purchasers such as Marion
accordingly "lack standing to assert claims under the Act,"  *In re Effexor Antitrust Litigation*,
2018 WL 6003893, at \*16 (D.N.J. Nov. 15, 2018), which is the law of Marion's home state and
place of alleged injury. And since Marion has not alleged that it suffered injury anywhere else,
Marion also lacks standing to bring antitrust claims under other states' laws.  *See In re
Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 156-58 (E.D. Pa. 2009).  Without the ability to
recover under the antitrust laws of any state, Marion's purported injuries cannot be redressed by
a favorable decision and it therefore lacks Article III standing to bring these alternative state law
claims. *See Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992).  Accordingly, Marion's state
law claims should all be dismissed.

## IV.      CONCLUSION

For the foregoing reasons, Marion's complaint should be dismissed.

Dated: February 21, 2019

SIMPSON THACHER & BARTLETT LLP

By   /s/ Abram Ellis
Abram Ellis
aellis@stblaw.com
Peter C. Thomas
pthomas@stblaw.com
Sara Razi
sara.razi@stblaw.com
900 G. St., NW
Washington, D.C. 20001
Telephone: +1-202-636-5500
Facsimile: +1-202-636-5502

*Attorneys for Defendants McKesson
Corporation and McKesson Medical-Surgical,
Inc.*