# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724 |
| | HON. CYNTHIA M. RUFE |
| THIS DOCUMENT RELATES TO:<br><br>*Marion Diagnostic Center, LLC,* et al. *v. McKesson Corporation,* et al. | Civil Action No. 18-4137 |

## OPINION

**Rufe, J.**                                                                                                                                                           **June 26, 2019**

In this multidistrict litigation, Plaintiffs allege that Defendants engaged in an antitrust conspiracy by allocating the market for and fixing the prices of certain generic pharmaceutical products. In this Opinion, the Court considers a motion by Defendants McKesson Corporation and McKesson Medical Surgical, Inc. (collectively, "McKesson")[1] to dismiss the claims brought against them by Plaintiffs Marion Diagnostic Center, LLC and Marion Healthcare, LLC (collectively "Marion"). For the reasons that follow, Marion's claims against McKesson will be dismissed.

## I.    BACKGROUND

"Marion Diagnostic Center LLC is a limited liability company formed under the laws of the State of Illinois, with its principal place of business in Marion. Illinois."[2] It "operates a multidisciplinary healthcare facility including an outpatient surgery practice, a diagnostic center,

---

[1] Other Defendants have also filed motions to dismiss McKesson's second amended complaint. Their motions will be decided separately.

[2] Marion Second Am. Compl. ¶ 12.

and a walk-in clinic."³ "Marion HealthCare, LLC" also has its principal place of business in Marion, Illinois – a multi-specialty surgery center.⁴ It is an LLC formed under Illinois law.⁵

In its second amended complaint, Marion asserts a claim under Section 1 of the Sherman Act against a number of generic drug manufacturers and against McKesson, "one of the four largest distributors of generic drugs in the United States."⁶ Marion alleges it "directly purchased" a variety of generic drugs "through" McKesson⁷ and brings its Sherman Act claim on behalf of a putative class of "[a]ll persons or entities that have directly purchased generic drugs from conspirator McKesson in the United States from September 25, 2014 though the present . . . ."⁸ Marion also asserts claims against McKesson "in the alternative" under various state laws on behalf of a putative class of indirect purchasers encompassing "[a]ll United States healthcare providers purchasing the generic drugs of Defendant manufacturers through distributors and wholesalers from September 25, 2014 through the present."⁹

Marion contends that there are "compelling indications that the largest Defendant [generic drug] manufacturers . . . have enlisted tacitly or explicitly distributor McKesson as a cooperating co-conspirator (and possibly other unnamed distributors) to aid and conceal their

---

³ *Id.*

⁴ *Id.* ¶ 13.

⁵ *Id.*

⁶ Marion Second Am. Compl. ¶ 14 and ¶¶ 132-35.

⁷ *Id.* ¶¶ 12-13.

⁸ *Id.* ¶ 124.

⁹ *Id.* ¶ 139. Marion's second amended complaint defines healthcare providers to include "hospitals, medical or diagnostic clinics, outpatient centers, long-term care facilities, and surgery centers" and to exclude "pharmacies operated by private or public corporations, insurance companies or pension plans purchasing generic drugs." *Id.*

price fixing and market allocation across the generic drug industry."[10] It asserts that members of its proposed class "have paid above-competitive prices" as a result of the alleged industry-wide conspiracy.[11] Marion contends that there is "strong circumstantial evidence of McKesson's cooperation" in the alleged conspiracy.[12] In support of its claims, Marion alleges that

> [n]umerous, sophisticated McKesson purchasing personnel can hardly have failed to notice that, for a number of years, bidding for McKesson's high-volume, attractive business for numerous generic drugs has been much less than robust and fully-competitive (because its business has been allocated to one of the Defendant manufacturers so that the manufacturer could obtain its agreed "fair share" of a particular drug).[13]

It also alleges that "McKesson's buying personnel can hardly have failed to notice . . . the radical . . . price spikes paid by McKesson in 2013 and 2014 for more than 1,200 generic medications (where prices increased on average 448 percent between July 2013 and July 2014)."[14] Marion alleges that McKesson "must have been [or] become aware that the only plausible explanation was anticompetitive conduct by Defendant manufacturers . . . ."[15] It contends that Defendant drug manufacturer Heritage "centrally coordinated" the alleged price-fixing and market allocation conspiracy, Heritage "claims to be closely 'strategically-aligned' with McKesson" and, as a result, "McKesson has a ready, close source of intelligence to confirm any suspicions of anticompetitive activity . . . ."[16] Marion also alleges that "the movement of

---

[10] *Id.* ¶ 7.

[11] *Id.* ¶ 135.

[12] *Id.* ¶ 73.

[13] *Id.* ¶ 77.

[14] *Id.* ¶ 78.

[15] *Id.* ¶ 79.

[16] *Id.* ¶ 81.

3

officers between McKesson and additional central conspirators [drug manufacturers] Mylan and Teva has further facilitated its cooperation with, and concealment of, the overarching conspiracy."[17] It alleges that two former employees of Mylan Pharmaceuticals now work at McKesson and two now work at McKesson Canada.[18] Marion also alleges that five former McKesson employees now work for Defendants Mylan and Teva in various capacities.[19] Marion contends that McKesson's "collusion is also highly probable if one follows the money."[20] It asserts that "McKesson has made each year (since at least 2013) billions of dollars of additional margins on its resale of generic drugs due to i[t]s routine percentage mark-up of the conspiracy's above-competitive pricing."[21] Marion alleges that "[t]hese additional billions realized by McKesson annually are powerful reasons why it has cooperated with, and concealed, several years of conspiracy . . . ."[22]

## II. STANDARD OF REVIEW

McKesson moves to dismiss Marion's claims against it pursuant to Federal Rule of Civil Procedure 12(b)(6) which provides for dismissal of a complaint for failure to state a claim when a plaintiff's "plain statement" lacks enough substance to show that it is entitled to relief.[23] On a motion to dismiss, the Court "consider[s] plausibility, not probability . . . ."[24] A claim is

---

[17] *Id.* ¶ 87.

[18] *Id.* ¶¶ 92-95.

[19] *Id.* ¶¶ 96-99 and 102-104.

[20] *Id.* ¶ 105.

[21] *Id.* ¶ 123.

[22] *Id.* ¶ 112.

[23] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

[24] *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 260 (3d Cir. 2017); *see also Twombly*, 550 U.S. at 570 (holding that a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face").

4

plausible when the facts pled "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[25] Plaintiffs are not required "to plead facts that, if true, definitely rule out all possible innocent explanations."[26] "But there is a difference between allegations that stand on well-pleaded facts and allegations that stand on nothing more than supposition."[27] "[J]udging the sufficiency of a pleading is a context-dependent exercise."[28] In the antitrust context, a complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made."[29]

## III. DISCUSSION

### A. FAILURE TO STATE A SHERMAN ACT CLAIM

McKesson argues that Marion cannot state a Sherman Act claim against it merely by alleging that McKesson "should have known about the conspiracy and . . . did not do enough to counteract it."[30] Indeed, to state a Section 1 claim against McKesson, Marion must allege "some form of concerted action . . . , in other words, a unity of purpose or a common design and understanding or a meeting of minds or a conscious commitment to a common scheme . . . ."[31] "[T]he issue is whether the pleading delineates to some sufficiently specific degree that a

---

[25] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

[26] *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 753 (E.D. Pa. 2014).

[27] *Finkelman v. Nat'l Football League*, 810 F.3d 187, 201 (3d Cir. 2016).

[28] *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010).

[29] *Twombly*, 550 U.S. at 556.

[30] McKesson Mem. in Support of Mot. to Dismiss Marion Pls.' Am. Compl. at 8.

[31] *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010) (citations and internal quotation marks omitted).

5

defendant purposefully joined and participated in the conspiracy."[32] A Section 1 claim will not be "considered adequately pled because of the bare possibility that discovery *might* unearth direct evidence of an agreement."[33] Marion must "state enough facts to 'raise a reasonable expectation that discovery will reveal evidence of illegal agreement,' even if the court believes such proof is improbable."[34]

An agreement may be shown "by alleging direct or circumstantial evidence, or a combination of the two."[35] Marion's claims against McKessson do not rest on direct evidence of an agreement.[36] In its second amended complaint, Marion asserts that "circumstantial evidence of tacit McKesson cooperation and concealment is sufficient as a matter of law plausibly to allege McKesson as a co-conspirator."[37] Marion maintains that it has plausibly alleged that McKesson "tacitly or expressly worked in parallel with [the manufacturer-level conspiracy] to provide the concealment essential for the conspiracy's continuance . . . ."[38]

McKesson argues that Marion has not met its obligation to plead parallel conduct because McKesson is "a distributor . . . situated at a different level of the supply chain from the manufacturers and fulfills a wholly different function from the manufacturers . . . ."[39] Indeed, in

---

[32] *In re Processed Egg Prod. Antitrust Litig.*, 821 F. Supp. 2d 709, 720 (E.D. Pa. 2011).

[33] *Ins. Brokerage*, 618 F.3d at 324 (emphasis added).

[34] *SigmaPharm, Inc. v. Mut. Pharm. Co.*, 772 F. Supp. 2d 660, 669 (E.D. Pa. 2011) (quoting *Twombly*, 550 U.S. at 556), *aff'd* 454 F. App'x 64 (3d Cir. 2011).

[35] *W. Penn Allegheny*, 627 F.3d at 99.

[36] Marion only speculates that documents discovered by the State Attorneys General "*may* reveal direct evidence of McKesson's knowledge of the conspiracy and (a) its express or tacit cooperation with the conspiracy; and (b) its concealment of the conspiracy." Marion Second Am. Compl. ¶ 72 (emphasis added).

[37] *Id.* ¶ 113. Of course, courts are not bound to accept as true legal conclusions couched as factual allegations. *Twombly*, 550 U.S. at 555, 564.

[38] Marion Opp'n to McKesson Mot. to Dismiss at 7.

[39] McKesson Mem. in Support of Mot. to Dismiss Marion Pls.' Am. Compl. at 11.

6

its second amended complaint, Marion makes no explicit allegations of parallel conduct by McKesson. Marion alleges only that McKesson, like the manufacturer Defendants, saw increased profits because of McKesson's "routine percentage mark ups of above-competitive pricing" and "unlawful inflation of pricing across the generic drug industry."[40] However, Marion has not directed the Court to any authority that would support the proposition that McKesson's conduct – pricing generic drugs for resale *after* purchase from the manufacturer Defendants – was parallel to the manufacturer Defendants' conduct simply because each are alleged to have seen increased profits. Marion has not plausibly alleged that McKesson engaged in parallel conduct.

Even if Marion's allegations were enough to plead parallel conduct, its second amended complaint would still fall short of stating a Sherman Act claim against McKesson. "[A] claim based on parallel – even consciously parallel – conduct alone would be insufficient to survive dismissal . . . ."[41] Marion's "allegations of parallel conduct . . . must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."[42]

> For circumstantial evidence of an agreement, . . . a plaintiff must allege both parallel conduct and something "more" . . . . This "more" could include evidence (1) "that the defendant had a motive to enter into a . . . conspiracy," (2) "that the defendant acted contrary to its interests," or (3) "implying a traditional conspiracy."[43]

---

[40] Marion Second Am. Compl. ¶ 73; *see also id.* ¶ 109 (quoting 10-K forms McKesson filed with the U.S. Securities and Exchange Commission: "we benefit when the manufacturers increase their prices as we sell our existing inventory at the new higher prices").

[41] *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 335 (3d Cir. 2018) (citing *Ins. Brokerage*, 618 F.3d at 321).

[42] *Twombly*, 550 U.S. at 557.

[43] *Lifewatch Servs.*, 902 F.3d at 333 (quoting *Ins. Brokerage*, 618 F.3d at 321-22).

7

Although Marion alleges that "[m]ultiple plus factors plausibly suggest" a "meeting of the minds" between McKesson and manufacturer Defendants,[44] the requisite "more" is missing from Marion's second amended complaint. Marion alleges in conclusory manner that "the largest Defendant manufacturers . . . have enlisted tacitly or explicitly distributor McKesson as a cooperating co-conspirator . . . ."[45] But Marion does not allege how McKesson was "enlisted" to cooperate in the alleged conspiracy. The second amended complaint includes no factual allegations that would give substance to McKesson's purported role in the alleged conspiracy. "[S]prinkling a complaint with conclusory assertions that a party was a 'participant in coordinated conduct' or a 'conspirator' or acted in 'concert' with others does not make the requisite showing of entitlement to relief mandated by Rule 8(a)(2)."[46]

Marion asserts that McKesson "facilitated its cooperation with, and concealment of, the overarching conspiracy" through "the movement of officers between McKesson and additional central conspirators Mylan and Teva . . . ."[47] Marion alleges that it was "likely" that a former Mylan employee "carried his intimate knowledge of the overarching conspiracy with him to McKesson"[48] and that a second former Mylan employee hired by McKesson "likely had knowledge of the [Mylan's] pricing of" certain Mylan products.[49] Marion alleges that a third former Mylan employee hired by non-Defendant McKesson Canada "provides . . . another ready

---

[44] Marion Second Am. Compl. ¶ 123.

[45] *Id.* ¶ 7.

[46] *In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 376 (M.D. Pa. 2008).

[47] Marion Second Am. Compl. ¶ 87.

[48] *Id.* ¶ 92.

[49] *Id.* ¶ 95.

8

window into Mylan's participation in the overarching conspiracy"[50] and that another former Mylan employee hired by McKesson Canada "was likely aware of his employer's collusion."[51] However, Marion offers no facts to show how the "likely" knowledge of these former Mylan employees creates a reasonable inference that McKesson agreed to participate in the alleged conspiracy to allocate the market for and fix the prices of certain generic pharmaceutical products. Nor has Marion shown how the individuals alleged to have previously worked for McKesson and who now work for manufacturer Defendants[52] make McKesson's participation in the manufacturer Defendants' alleged conspiracy any more likely.[53] The allegations of employee movement between McKesson and certain manufacturer Defendants are insufficiently specific to sustain Marion's Section 1 claim against McKesson.

Marion alleges that it is "plausible" that McKesson cooperated with the alleged conspiracy because of "its close relationship with co-conspirators Heritage" and two Heritage executives who have pled guilty to engaging in price fixing and market allocation.[54] Marion contends that Heritage told another manufacturer Defendant not to bid for McKesson's

---

[50] *Id.* ¶ 94.

[51] *Id.* ¶ 93.

[52] *Id.* ¶¶ 96-104 (alleging former McKesson employees hired by manufacturer Defendants Mylan and Teva provided McKesson with "ready source[s] of information" regarding the alleged conspiracy).

[53] *Cf. Hall v. United Air Lines, Inc.*, 296 F. Supp. 2d 652, 662 (E.D.N.C. 2003) (finding on summary judgment that evidence that three executives were "former employees of airlines that were involved in prior antitrust litigation" was insufficient to establish a link between the alleged antitrust conspiracy and the defendant in the absence of evidence that the former employees "were involved in the alleged conspiratorial activity while they were employed by the other defendant airlines, or that they somehow implemented the conspiracy once they came to work for" the defendant airline). *But see In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 632 (E.D. Pa. 2010) (finding allegations of conspiracy were made more plausible by allegations that defendants hired high-ranking employees from one another because of the "personal networks and relationships that these employees brought with them").

[54] Marion Second Am. Compl. ¶ 84.

9

business.⁵⁵ McKesson responds that "there is nothing suspicious" about a relationship between a distributor and a manufacturer.⁵⁶ Marion has not pleaded sufficient facts regarding McKesson's alleged relationship with Heritage to render plausible its claim that McKesson was cooperating in the alleged conspiracy with the manufacturer Defendants.⁵⁷

Responding to McKesson's motion, Marion also argues that McKesson had an "exceptionally strong motive" to conspire,⁵⁸ echoing its allegation that "McKesson is certainly strongly financially motivated to cooperate with, and conceal, the conspiracy."⁵⁹ Marion's second amended complaint cites "billions of dollars of additional . . . margin[s]" McKesson has made each year since at least 2013 due to "its routine percentage mark-up" of the manufacturer Defendants' generic drug prices.⁶⁰ But "[p]rofit is a legitimate motive in pricing decisions, and something more is required before a court can conclude that competitors conspired to fix pric[es]."⁶¹ Without more, McKesson's pricing structure is not enough to plead a plus factor suggestive of McKesson's participation in the alleged manufacturer conspiracy.

Marion also alleges that McKesson has "acted contrary to its independent, rational economic self-interest . . . by continually accepting large, unlawful price increases and

---

⁵⁵ *Id.* ¶ 85.

⁵⁶ McKesson Mem. in Support of Mot. to Dismiss Marion Pls.' Am. Compl. at 14.

⁵⁷ *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 762 (1984) ("[T]hat a manufacturer and its distributors are in constant communication about prices and marketing strategy does not alone show that the distributors are not making independent pricing decisions.")

⁵⁸ Marion Opp'n to McKesson Mot. to Dismiss at 8.

⁵⁹ Marion Second Am. Compl. ¶ 73.

⁶⁰ *Id.*; *see also id.* ¶ 123.

⁶¹ *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 134-35 (3d Cir. 1999).

10

submitting to reduced bidding . . . ."[62] The Third Circuit has recognized that a company's actions against its self-interest can constitute a plus factor.[63] But Marion' contention that McKesson acted against its own economic interest is contrary to the above-cited allegation that McKesson profited from the alleged increase in generic drug prices. Further, Marion has not alleged facts to show how it was irrational for McKesson to continue purchasing from the manufacturer Defendants or that McKesson had available alternative suppliers.[64] Absent such allegations, Marion has not shown McKesson's actions were so contrary to its own interests that they allow Marion's Section 1 claim against McKesson to withstand dismissal.

Marion also suggests that McKesson had an opportunity to conspire with manufacturer Defendants because McKesson sponsored and attended trade association events.[65] However, the second amended complaint alleges only that "some of" the trade shows "were sponsored all or in part by McKesson" and that "any McKesson inquiries at the many 'cozy' trade shows . . . used to facilitate the overarching conspiracy . . . plausibly are sources of intelligence as to anticompetitive conduct."[66] McKesson argues these allegations are insufficient to permit Marion's claims against it to withstand dismissal because "Marion's complaint does not actually put McKesson in the room where the encounters allegedly happened . . . ."[67] The Court agrees. Marion does not identify any specific trade association meeting with McKesson's sponsorship or

---

[62] Marion Second Am. Compl. ¶ 123.

[63] *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 (3d. Cir. 2004).

[64] McKesson Mem. in Support of Mot. to Dismiss Marion Pls.' Am. Compl. at 13.

[65] Marion Opp'n to McKesson Mot. to Dismiss at 8 (arguing that McKesson's purchasing and other officers and manufacturer Defendants' sales personnel had face-to-face meetings at "many trade association shows, some sponsored by McKesson").

[66] Marion Second Am. Compl. ¶ 82.

[67] McKesson Mem. in Support of Mot. to Dismiss Marion Pls.' Am. Compl. at 15.

11

any McKesson employee with relevant authority who attended a trade association meeting alongside any manufacturer Defendant's representative. Marion's allegations are nothing more than impermissible supposition.

Marion's second amended complaint also alleges that an "industry intelligence-gathering firm" has reported that the Department of Justice "is investigating the extent to which trade associations and industry conferences have been used as forums for collusion among competitors."[68] Marion's allegations that McKesson is "reportedly" under investigation for participation in the alleged conspiracy[69] fall short of supporting a claim that McKesson purposefully joined and participated in the alleged conspiracy. "[I]n the right circumstances, 'government investigations may be used to bolster the plausibility of § 1 claims,'"[70] but those circumstances are not present where Marion has alleged only that McKesson *could* be the subject of an investigation. Here too, Marion's allegations amount only to impermissible supposition.

In sum, Marion has not sufficiently alleged any plus factor that would make plausible a claim that McKesson's conduct was the result of an agreement with the manufacturer Defendants "and not the result of independent business decisions . . . ."[71] Marion's Section 1 claim rests only on McKesson's "likely" awareness of the manufacturer Defendants' alleged conspiracy. This is not enough to permit the Court to infer that McKesson agreed to participate. Indeed, without more, even "[k]nowledge of the existence of an agreement" amongst the manufacturing defendants to restrain competition is not enough to support an inference that McKesson was a

---

[68] Marion Second Am. Compl. at ¶ 120.

[69] *Id.* ¶¶ 118-19.

[70] *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 452 (E.D. Pa. 2018), (quoting *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106, 115 (S.D.N.Y. 2011)).

[71] *Baby Food*, 166 F.3d at 122.

co-conspirator.[72] "[A] district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed."[73] The Court will dismiss Marion's Section 1 claim against McKesson.

### B. ANTITRUST STANDING

Even if Marion's allegations were sufficiently specific to plead a Section 1 claim against McKesson – and they are not – the Court would still dismiss the claim because Marion has not plausibly alleged that it is a direct purchaser with statutory standing to recover antitrust damages. Pursuant to *Illinois Brick Co. v. Illinois*,[74] there is a "general rule that only direct purchasers from antitrust violators may recover damages in antitrust suits."[75] Although Marion characterizes itself as a direct purchaser,[76] the mechanics of the purchasing relationship set forth in the second amended complaint show otherwise. Marion alleges that it purchased generic drugs "through" McKesson. But Marion's use of the word *through* in the second amended complaint does not convert it into a direct purchaser *from* the manufacturer Defendants who are alleged to have fixed the prices and allocated the market for the drugs Marion purchased. Under the allegations in the second amended complaint, Marion is "the *second* purchaser in the chain of distribution" and is thus an indirect purchaser barred from seeking damages under the Clayton Act.[77]

---

[72] *Pressure Sensitive Labelstock*, 566 F. Supp. 2d at 376.

[73] *Twombly*, 550 U.S. at 558 (citation and internal quotation omitted).

[74] 431 U.S. 720 (1977).

[75] *Howard Hess Dental Labs., Inc. v. Dentsply Intern., Inc.*, 424 F.3d 363, 369 (3d Cir. 2005); *see Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019) ("Our decision in *Illinois Brick* established a bright-line rule that authorizes suits by direct purchasers but bars suits by indirect purchasers.").

[76] Marion Second Am. Compl. ¶ 12.

[77] *Warren Gen. Hosp. v. Amgen, Inc.*, 643 F.3d 77, 88 (3d Cir. 2011); *see also Apple*, 139 S. Ct. at 1520 ("[I]ndirect purchasers who are two or more steps removed from the violator in a distribution chain may not sue.").

Further, Marion's allegations do not permit it to take advantage of the co-conspirator exception to the *Illinois Brick* direct purchaser rule. As the Court of Appeals has explained,

> [T]he limited co-conspirator exception to the direct purchaser rule . . . allows an entity to sue its supplier and its supplier's supplier if (1) it sues both at once, *and* (2) the immediate supplier (i.e., the middleman) was so wrapped up in the conspiracy that it would be barred from seeking antitrust relief against the top-level supplier in a suit of its own.[78]

Marion has not alleged that McKesson's involvement in the alleged conspiracy "was so truly complete" that McKesson would be barred as a matter of law from bringing its own suit.[79] Marion's allegation that McKesson "must have known" about the alleged conspiracy is not enough to plead that McKesson is a co-conspirator, so as to exempt Marion from the *Illinois Brick* bar against indirect purchaser claims. Marion's Section 1 claim against McKesson will be dismissed.

### C. STATE LAW CLAIMS

Marion's second amended complaint asserts claims in the alternative under various state laws seeking to recover on behalf of itself and a putative indirect purchaser class.[80] However, Marion seeks to recover under Illinois law on behalf of itself alone, and not on behalf of a class.[81] Although the Illinois Antitrust Act permits Marion to seek to recover on its own behalf,[82] it cannot proceed with its Illinois Antitrust Act claim as an individual for the same

---

[78] *Wallach v. Eaton Corp.*, 837 F.3d 356, 362 n.3 (3d Cir. 2016) (emphasis in original).

[79] *Howard Hess Dental Labs., Inc.*, 424 F.3d at 378-79.

[80] Marion Second Am. Compl. ¶ 139.

[81] *Id.* ¶ 149. The Court previously held in this multidistrict litigation that the Illinois Antitrust Act prohibits indirect purchaser class actions. *In re Generic Pharm. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 834 (E.D. Pa. 2019).

[82] *See* 740 Ill. Comp. Stat. 10/7(2) ("No provision of this Act shall deny any person who is an indirect purchaser the right to sue for damages.").

reasons that it cannot proceed under the Sherman Act.[83] The Illinois antitrust claim, like the federal one, fails to state a claim upon which relief can be granted. Thus, Marion's Illinois Antitrust Act claim against McKesson will be dismissed.

In addition, because Marion does not (and cannot) pursue its Illinois Antitrust Act claim on behalf of a class and because Marion has not alleged that it suffered an injury anywhere else, McKesson argues that Marion lacks standing to bring class claims against McKesson under the laws of any other state.[84] Responding to McKesson's motion, Marion does not dispute that it has not alleged that it operates in or was injured in a state other than Illinois.[85] Rather, Marion argues that it may proceed with its class claims under other state laws because it "indisputably may seek damages for itself under Illinois law" and because it "would also have standing to seek injunctive relief under its federal claims."[86] Marion contends that whether it "may serve as a representative of classes of healthcare providers who have suffered damages in states other than Illinois is a . . . question[ ] which must be decided . . . in the context of the class certification analysis required under Rule 23 of the Federal Rules of Civil Procedure."[87]

The Court is faced once again with the "surprisingly difficult question" presented by

---

[83] *See Laughlin v. Evanston Hosp.*, 550 N.E. 2d 986, 989-90 (Ill. 1990) (holding that the Illinois Act is patterned on the Sherman Act and should be construed as the Sherman Act is); *see also Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010) (holding the Illinois Antitrust Act "parallels the federal Sherman and Clayton Acts" and finding that the plaintiff's state antitrust claim failed to state a claim where it was based on "the inadequate allegations contained in the federal antirust claim"); 740 Ill. Comp. Stat. Ann. 10/11 ("When the wording of this Act is identical or similar to that of a federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide in construing this Act.").

[84] McKesson Mem. in Support of Mot. to Dismiss Marion Pls.' Second Am. Compl. at 20.

[85] Marion Opp'n to McKesson Mot. to Dismiss at 18.

[86] *Id.* at 19.

[87] *Id.* (citation and internal quotation omitted).

"[t]he interplay between Article III standing and class standing . . . ."[88] When the Court in this multidistrict litigation was previously confronted with this question, the relevant defendants did not dispute that the relevant plaintiffs had standing to pursue *class* claims under the laws of jurisdictions where they had paid for generic drugs.[89] Under those circumstances, the Court declined to dismiss the relevant plaintiffs' claims on behalf of absent class members for lack of Article III standing. The Court held that it was "both proper and more efficient to consider whether" the named plaintiffs could pursue their state law claims on behalf of the unnamed class members in the context of the Rule 23 class certification analysis because their state law claims were largely parallel to those of the putative class members.[90] The plaintiffs had alleged enough "to demonstrate a substantial and shared interest in proving that [the relevant] Defendants' alleged unlawful conduct resulted in overpayments for the [relevant] drugs, injuries redressable by an award of damages under the state antitrust, consumer protection and unjust enrichment laws cited in the [relevant plaintiffs'] complaints."[91]

The difference this time is that Marion has not alleged that it has standing for any state law claim that it may bring against McKesson on behalf of a class. Marion has not alleged that it suffered an injury in any state other than Illinois and would be able to assert only an *individual* claim under Illinois law (although it has not successfully done so in the second amended complaint). Because Marion may only proceed as a plaintiff under Illinois law on behalf of itself

---

[88] *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-md-2503, 2015 WL 5458570, at *13 (D. Mass. Sept. 16, 2015).

[89] *Generic Pharm. Pricing*, 368 F. Supp. 3d at 828 ("No named Plaintiff seeks relief for itself under the laws of a jurisdiction where it would not have standing.").

[90] *Id.* at 831.

[91] *Id.*

and because Marion's federal antitrust claim is not sufficiently pled to withstand dismissal, it is appropriate to dismiss Marion's other state law claims as against McKesson.

### D. LEAVE TO AMEND

Because Marion has already amended its complaint, it may further amend its complaint "only with the opposing party's written consent or the court's leave."[92] In response to McKesson's motion to dismiss, Marion does not expressly seek leave to amend its Section 1 claim against McKesson. Marion does ask that the Court grant it "leave to amend to add an additional class representative to allow the [state-law] claims to proceed for states other than Illinois."[93] Rule 15(a)(2) of the Federal Rules of Civil Procedure directs the Court to "freely give leave [to amend] when justice so requires."[94] Denial "is justified on the grounds of "undue delay, bad faith, prejudice to the opposing party, or futility."[95] So instructed, the Court will not preclude Marion from seeking leave to file a further amended complaint in the event that it is able to allege sufficient facts to state a claim against McKesson consistent with this Opinion.[96] Marion must file a motion for leave to amend prior to filing any amended complaint.

An appropriate Order follows.

---

[92] Fed. R. Civ. P. 15(a)(2).

[93] Marion Opp'n to McKesson Mot. to Dismiss at 19.

[94] *Id.*

[95] *Jang v. Boston Sci. Scimed, Inc.*, 729 F.3d 357, 367 (3d Cir. 2013).

[96] In its motion, McKesson has also asked that the Court give "full and equal effect to" its February 15, 2019 Order with respect to any of Marion's surviving state law claims. McKesson Mem. in Support of Mot. to Dismiss Marion Pls.' Second Am. Compl. at 20. The Court's February 15 decision addressed the sufficiency of certain state antitrust claims asserted in other complaints in this multidistrict litigation. Because the Court has found that Marion has not sufficiently alleged that it has standing to pursue state antitrust claims on behalf of a class, it will not reach the substance of the other state law claims alleged in Marion's second amended complaint. If Marion decides to file a further amended complaint, it should review the Court's previous decision prior to reasserting any state antitrust claims. *See* 368 F. Supp. 3d 814.